DOD G. GIBSON v. PLEASANT VALLEY DEVELOPMENT COMPANY and E. E. McKEE, Plaintiffs in Error.—8 S. W. (2d) 828.

Division Two, July 20, 1928.

*Cleary & Barnett* and *John R. James* for plaintiffs in error.

830

*Davis & Woodruff* and *John A. Hope* for defendant in error.

WHITE, P. J.—The defendant in error brought suit in the Circuit Court of Jackson County to recover a real estate commission of one hundred thousand dollars. The petition, in two counts, alleges in the first count, that in October, 1918, the plaintiff, defendant in error here, entered into a written contract with the Pleasant Valley Development Company, through E. E. McKee, its president and general manager, whereby it agreed to pay him a commission of one hundred thousand dollars if he should secure a purchaser of a tract of land consisting of sixteen thousand acres known as the Iron Mountain Tract, for the price of $575,000. That the plaintiff fully performed his contract, secured one W. J. Elledge and his associates as purchasers at a price acceptable to the defendant, and said Elledge and associates purchased said tract; wherefore the plaintiff demanded the sum of one hundred thousand dollars.

The second count realleges the statements of the first count and proceeds:

"Plaintiff further alleges that he began the performance of said contract, which is herewith filed and marked 'Plaintiff's Exhibit A.' on the —— day of October, 1918, the date of the execution of said contract, but that after he had introduced said W. J. Elledge to said E. E. McKee and the officers of said Pleasant Valley Development Company and started negotiations with said Elledge for the sale of said 'Iron Mountain Tract' to him, the defendants insisted upon dealing directly with said W. J. Elledge and his associates and ignored the plaintiff and refused to permit plaintiff to assist defendants in negotiating the sale of said 'Iron Mountain Tract' to said W. J. Elledge and his associates and that defendants by their actions as aforesaid, would not permit plaintiff to proceed further with said contract; and plaintiff states that he was prevented by the defendants from completing the same."

He then states that the reasonable value of the services rendered by him was one hundred thousand dollars, for which he asks judgment.

The court, at some stage of the proceeding, ordered that the plaintiff take nothing by his first count, and the trial proceeded on the second count.

The contract which is the subject of the suit, is as follows:

## "Plaintiff's Exhibit A.

"This memorandum of agreement made and entered into this — day of October, 1918, by and between E. E. McKee, as Party of the First Part, and Dod G. Gibson, as party of the Second Part, Witnesseth,

"That, Whereas, the said Party of the First Part has a tract of land comprising sixteen thousand (16,000) acres, more or less, known as the 'Iron Mountain Tract,' for sale, and the Second Party, Dod G. Gibson, has in view a purchaser thereof at five hundred seventy-five thousand dollars ($575,000).

"Now Therefore, it is agreed that if the Dod G. Gibson shall secure said purchaser at the said price of five hundred seventy-five thousand dollars ($575,000), and the said deal is finally perfected, the said Dod G. Gibson shall receive for his services in connection therewith the sum of one hundred thousand dollars ($100,000), which shall be paid as and when received by the said E. E. McKee. And,

"Whereas, the contract contemplates that two hundred thousand dollars ($200,000) in cash and deferred payments shall be paid to the said E. E. McKee under the contract of sale in the following amounts, to-wit: Ten thousand dollars ($10,000) cash and ten thousand dollars ($10,000) for four consecutive months thereafter, and fifteen thousand dollars ($15,000) for ten consecutive months following the said four months. The said one hundred thousand dollars ($100,000) commission shall be paid from this amount as follows:

"Five thousand dollars ($5000) of the first ten thousand dollars ($10,000) cash; five thousand dollars ($5000) per month for eleven (11) consecutive months thereafter; ten thousand dollars ($10,000) for the next consecutive month and fifteen thousand dollars ($15,000) for the two following months thereafter, making a total of one hundred thousand dollars ($100,000). That if for any reason the contract or sale be varied without the consent of E. E. McKee so that two hundred thousand dollars ($200,000) cash is not realized for said property, in that event any deduction therefrom shall come from the one hundred thousand dollars ($100,000) to be paid as commissions under this contract and said McKee shall nevertheless receive one hundred thousand dollars ($100,000) net, that is to say if said Gibson in order to induce a sale is willing to discount his own commission in favor of the purchaser said McKee shall not object thereto nor shall he suffer any diminution of the amount due him under this contract as aforesaid by reason thereof."

McKee and the Pleasant Valley Development Company answered separately, each denying the allegations of the petition, setting up certain facts in relation to the transaction not necessary to set out

at length, and among other things, that Elledge, the purchaser, and Gibson were associated together in the contract, Exhibit A, although Gibson only was named in it, and that this was disclosed to the defendant.

A large volume of confusing evidence was introduced on the issues tendered, the case submitted to a jury on the second count, and a verdict returned in favor of the plaintiff for fifteen thousand dollars. The defendant then sued out the writ of error in this court.

I. After the evidence was in the plaintiff asked leave to strike out that part of the second count of the petition where he alleges that he began a performance of the contract on the — day of October, 1918, and to amend by averring that on or about March 1, 1918, prior to the signing of said contract, at the instance and request of the defendants and upon their promise to pay therefor, he gave much time and labor towards procuring a purchaser for the property, and that said contract was to provide for compensating the plaintiff for such previous labor and services to be thereafter rendered in negotiating a sale.

The plaintiff in error complains that this amendment is a departure from the original petition and therefore the evidence of prior services rendered in attempting to find a purchaser was incompetent. As we view the matter, it is unnecessary to consider the merits of that contention because, as will be seen presently, the petition, while counting upon the value of the services rendered before and after the signing of the contract, based the plaintiff's right to recover on the theory that the defendants *breached* the contract, prevented its being carried out, and therefore the plaintiff was entitled to recover in *quantum meruit*. If the plaintiff has proved facts sufficient to submit that issue to the jury, then he had made out a case in *quantum meruit*. His right to recover would depend upon his showing that the defendants did prevent his consummating a sale according to the terms of his commission contract, "Exhibit A."

II. The plaintiff produced sufficient evidence to show that he induced Elledge, his alleged purchaser, to become interested in the land.

McKee was president of the Pleasant Valley Development Company, the owner of the Iron Mountain Tract. He owned all the stock of that company, excepting two shares to other persons for the purpose of making up the board of directors. He was in fact the company. The chief value of the land consisted of an iron mine and about 300 acres of land upon which it was located.

The plaintiff had been engaged in the iron business and had been buying ore for the Mid-Continent Iron Company, which plays a part in the transactions under consideration. He testified that as early as February, 1918, long before the contract was executed, W. J. Elledge, whom he had known a long time, had sold a ranch in Arkansas for a large sum of money. Plaintiff had had previous talks with McKee about the Iron Mountain Tract. In June of that year he saw McKee; told him he was ready to come down with a buyer for the property, and later introduced Elledge as the purchaser. One F. D. Stevens and other persons, the Larrabees, were interested in the Mid-Continent Company, and it appears that the plaintiff's first efforts with Elledge were to get those people interested in the purchase of the property. Finally, after considerable negotiation which got nowhere, Elledge said to Gibson one day: "Oh, hell, damn it, I will take it all myself if Stevens don't come in and sign it."

That had reference to a written contract of purchase to be noted below. Elledge testified that Gibson kept after him in season and out of season about the purchase of the land. And Elledge further said in his testimony, in answer to the question, referring to Gibson: "Absolutely; it was absolutely through his solicitation that I bought the property."

Elledge was asked if when the Larrabee deal was off he and Gibson talked it over about the purchase of the property, and he answered: "I had decided months before to purchase the property alone; or purchase an interest in it, *if I could do so, if it could be done.*"

Thus the evidence is sufficient to show that Gibson was the procuring cause of Elledge's interest in the property. Gibson says Elledge bought it. It remains to be seen whether Elledge was a *purchaser*, such as contemplated by the plaintiff's contract with the defendants.

III. The contract. Exhibit A above, recites that it was entered on the . . . day of October, 1918. It was not in fact signed and delivered until November 12, 1918. On that day a contract, Exhibit 4, "by and between E. E. McKee, party of the first part, and a syndicate composed of W. J. Elledge, F. D. Stevens and others, parties of the second part," was signed and delivered. That was the contract by which plaintiff claims he sold the property.

It provided that the party of the first part agreed to sell and convey to the parties of the second part the Iron Mountain Tract for the sum of $575,000, with certain terms as to payments. The contract concludes with this paragraph:

"This agreement shall be in effect and binding upon the Parties hereto for a period of thirty (30) days from and after this 12th day

of November, 1918, and unless the said Second Parties comply herewith by fulfilling all conditions imposed upon them it shall become void and all rights accruing to either party hereunder shall cease."

It is signed as follows:

"E. E. McKee,
Party of the First Part.
W. J. Elledge,

. . . . . . . . . . . . . . . . . . . . . . . . . . . .,
. . . . . . . . . . . . . . . . . . . . . . . . . . . .,
. . . . . . . . . . . . . . . . . . . . . . . . . . . .,
Parties of the Second Part."

The plaintiff in explaining his claim said in his testimony:

"Mr. Elledge bought the property, gentlemen, under my negotiations for $575,000. He afterwards went behind me with Mr. McKee and bought it under a later contract and I found out in May that Mr. Elledge had taken possession, not under my contract, but under a different contract."

That is the contract of purchase Elledge referred to when he said he was induced by Gibson to buy it. It was the sale, the completion of which plaintiff claims was interrupted and prevented by the defendant.

The petition alleges:

"That defendants by their actions aforesaid would not permit plaintiff to proceed further with said contract (Exhibit A), and plaintiff states he was prevented by defendants from completing the same."

With reference to that contract the defendants in their brief make the point in this language:

"Under these circumstances, it seems evident that if defendants breached the written contract by making it impossible for plaintiff to perform it, he is entitled to recover in *quantum meruit*, not simply for the reasonable value of the services rendered after the formal written contract was signed, but he is entitled also to the reasonable value of the services performed before it was actually signed, and in contemplation of which it was signed."

It is clear that the contract which the plaintiff procured to be signed between McKee and Elledge, Exhibit 4, was not a contract of purchase, but an option. The concluding paragraph quoted above shows that it was to be in effect for thirty days, and if not completed within that time was to become null and void. It was a final draft of a contract which had been written in various forms several times. The plaintiff in his testimony said that they were trying to get Mr. Stevens to agree to a contract on those lines, and that the contract was not signed until November 12, 1918. Mr. McKee was

pressing to get some action. It was then that Jack (Elledge) said: "Oh, hell, I will take it all myself." This indicates that the contracts were thereafter signed—the plaintiff's contract for commission, and Elledge's syndicate contract for purchase—at the same time.

Neither Stevens, nor the Larrabees, nor anyone else comprising the syndicate mentioned in the contract, ever signed it; no part of it ever was carried into effect. In procuring the partial execution of that contract, therefore, the plaintiff did not produce a purchaser. Elledge did not purchase under that contract; it was not his contract but the contract of a syndicate, the members of which never signed it. It was never carried out nor attempted to be carried out. The plaintiff, however, claimed a commission for procuring that contract and demanded it of McKee some time in May, 1919—some six months after its execution.

IV. In making out his case the defendant introduced "Exhibit 2," a contract between Elledge and the Pleasant Valley Development Company, dated April 23, 1919, five months after the commission contract was signed, whereby Elledge agreed to buy the Iron Mountain Tract for the sum of two hundred thousand dollars, subject to the mortgage of $250,000 on the property, and to make certain payments. This contract was acknowledged by the Pleasant Valley Development Company May 13, 1919. A warranty deed in pursuance of it was introduced, dated the first day of May, 1919, acknowledged June 23, 1919. According to that contract Elledge got the property for $450,000; that is, $125,000 less than the price plaintiff had contracted to sell it for. He claims that the proof of such sale is sufficient to show that the defendant prevented him, the plaintiff, from carrying out his contract and selling the property to Elledge for the price of $575,000. The evidence shows without contradiction that the reason for the failure of sale to Elledge and his syndicate, under the contract of November 12, 1918, was that Elledge was unable to procure the signature of Stevens and other members of the syndicate.

The plaintiff offered no evidence that there was any possibility of carrying through the sale to Elledge or the syndicate for $575,000, or any sum authorized by his commission contract. He knew all the time that Elledge depended upon interesting the other members of the syndicate. He knew also that Elledge failed to interest the other members of the syndicate, Stevens and the Larrabees, and he knew *why*. Elledge testified that while he was endeavoring to get Stevens and others interested in it the armistice of November 11, 1918, was concluded: Demand for iron fell off on that account. The Mid-Continent people, the syndicate, ceased to be interested in it, and

that particular contract failed for that reason. The brief of the defendant in error says:

"After this agreement, November 12, 1918, was signed by Elledge and McKee, Elledge continued his efforts and interested the Mid-Continent people. But the armistice, ending the World War, had terminated a Government contract (by) which the Mid-Continent people had lost interest in the proposition."

Thus, not only the evidence shows, but the plaintiff admits, that this option contract by which he claims he sold the property to Elledge for $575,000 was never carried out, *because* the very people who were to be associated with Elledge in the purchase would not enter the deal; the end of the war had made mining of iron a less profitable business.

V. Elledge did in fact execute a binding contract with the Pleasant Valley Development Company for the purchase of the property for $450,000, and received deed. That the reduction in price was due to the end of the war and the lessening demand for iron appears from the evidence. While plaintiff asserts that this was the method by which the defendant prevented his making the sale to Elledge, the evidence shows and his brief states the contrary.

The defendants claimed all the time that the plaintiff was interested with Elledge in that purchase. The plaintiff denied that. But this is what occurred:

Elledge testified, and was corroborated by plaintiff, that plaintiff was to share with Elledge the commission he might receive for making the sale to Elledge's syndicate.

In August, 1919, plaintiff testified, two months after the deed to Elledge was executed and *several months before it was recorded*, he, plaintiff, sold the property for $750,000, to one Clemons who represented the Mid-Nation Iron Products Company, *and Elledge divided the profits with him*. What was meant by the profits was the entire purchase price above what Elledge had paid for the property, $450,000, and sums he had expended upon it, amounting to something more than sixty thousand dollars. As to that plaintiff testified that he said to Elledge:

"'If I do, this is a separate, entire and distinct transaction from anything and I want one-half of the proceeds after you are paid your money back,' and he said, 'It is a bargain,' and he signed it."

In further explanation he said he sold the property for $750,000, or "very close to that." There were some deductions owing to numerous lawsuits, and he added: "I think between $650,000 and $750,000, to the best of my recollection."

Elledge testified, *and was corroborated by the plaintiff*, that when he was negotiating at first for the purchase of the property for his

syndicate, the Mid-Continent people, *he and Gibson were to share in the commission. When the property was sold for* $750,000, *he got half the net profits.* Thus, he must have got considerable more than one hundred thousand dollars out of the sale to Clemons.

VI. The sale to Elledge for $450,000 no doubt occurred because Elledge had become previously interested in the property through plaintiff's efforts. But the plaintiff does not sue for commission on that sale. He does not claim that he procured a purchaser at that price. The petition sounds upon a breach of contract and *quantum meruit* for *services rendered in performance of the contract.* He seeks to recover solely upon the ground that he was prevented by the defendant from causing a sale of the property to Elledge for the price mentioned in his contract, or for any other sum which would realize to McKee or the Pleasant Valley Development Company $475,000. He claims he rendered services in the performance of *that contract,* and that he was prevented by the defendant from consummating it. There is not a scintilla of evidence to show that he had any prospect of carrying out that contract. The evidence conclusively shows that he could not have made that sale to Elledge and his syndicate for any price authorized by the contract.

While the plaintiff claims that he had no interest in the property at any time other than that shown by his commission contract, his own evidence shows that *Elledge* was to receive half the commission to be paid for consummating the sale under his contract *to Elledge and his syndicate.* It further shows that he did have an interest in the property after Elledge purchased it for $450,000, because he was to have half the profits that came out of it when a sale should be finally made, and he *got half those profits.*

When a broker is employed to sell real estate upon an agreed commission at a fixed price, and does not procure a purchaser at that price and the owner sells at a less price, he is not entitled to a commission. [Hughes and Thurman v. Dodd, 164 Mo. App. 454, l. c. 460; Young v. Cooperage Works, 259 Mo. 215, l. c. 220.] The plaintiff claims that he was not given a reasonable time within which to procure a purchaser at the price mentioned in the contract. By his petition he does not claim any such ground for recovery. He simply alleges that the defendant prevented him from carrying out the contract with Elledge.

The evidence shows that it was impossible to carry out that particular contract. In fact, the plaintiff was not injured by that sale to Elledge because he was in better position thereafter than he was before. He was able, for reasons not disclosed, to procure another purchaser from Elledge for a much higher price, securing to himself a much greater commission.

The plaintiff failed to make out a case because he did not show one essential feature in his alleged cause of action: that he was prevented by the defendant from making a sale to Elledge and his syndicate. The judgment accordingly is reversed. All concur.