STATE OF MISSOURI at the Relation of ST. LOUIS UNION TRUST COMPANY, a Corporation, and D. C. BERRYMAN, as the Executors of the WILL of WILLIAM G. YANTIS, Deceased, Relators, v. ARTHUR C. HOEHN, as Assessor of the City of St. Louis, JESSE A. MITCHELL, CLARENCE EVANS and LAWRENCE BOOGHER, as Members of the State Tax Commission of Missouri, FORREST C. DONNELL, DWIGHT H. BROWN, ROY McKITTRICK, FORREST SMITH and WILSON BELL, as Members of the State Board of Equalization of Missouri.—No. 38505.—173 S. W. (2d) 393.

Court en Banc, July 6, 1943.

*Lowenhaupt, Waite & Stolar* and *Bryan, Williams, Cave & Mc-Pheeters* for relators.

*Roy McKittrick,* Attorney General, *Tyre W. Burton,* Assistant Attorney General, *Joseph F. Holland,* City Counselor, *H. A. Hamilton* and *Albert Miller* for respondents.

384

HYDE, J.—Certiorari to quash record of the State Board of Equalization and the State Tax Commission making an assessment of $378,000.00 as omitted property against the estate of William G. Yantis, deceased. Respondents [394] made separate returns and relator filed motion for judgment on the pleadings.

The $378,000.00 assessment, and assessment of certain other property not contested, was made by a three to two vote of the Board of Equalization upon the findings of fact made by the Tax Commission, as follows:

"The Commissioners further find that on the 26th day of May, 1941, William G. Yantis had on deposit in his checking account

at the First National Bank in St. Louis, the sum of $378,979.43, and that on said date he drew his check on said fund payable to said First National Bank in St. Louis in the amount of $378,000.00 and instructed said bank to use the same to purchase for his account United States Treasuery Bills of the face value of $378,000.00, maturing on June 4, 1941, which was on said day accordingly done; that said bills were immediately after their purchase left or deposited with the said First National Bank in St. Louis, with instructions from said William G. Yantis to collect the same at maturity and deposit the proceeds thereof to his credit in the checking account of said William G. Yantis at said First National Bank in St. Louis, being the same account from which the fund for their purchase was withdrawn on May 26, 1941. That thereafter on June 4, 1941, said Treasury Bills were collected by the First National Bank in St. Louis and the proceeds thereof, to-wit: $378,000.00, were deposited to the credit of William G. Yantis in his checking account aforesaid at the said First National Bank in St. Louis.

"The Commissioners further find that on May 7, 1940, said William G. Yantis withdrew from his checking account at the First National Bank in St. Louis the sum of $330,000.00, and with said withdrawn funds said First National Bank in St. Louis purchased for the account of said William G. Yantis Treasury Bills in that amount, maturing June 5, 1940, and deposited or left said bills with the First National Bank in St. Louis for collection at maturity with instructions to place the proceeds to his credit in his checking account at said bank, which was accordingly done. That on May 23, 1939, said William G. Yantis withdrew from his checking account at the First National Bank in St. Louis the sum of $237,000.00 and with said withdrawn funds said First National Bank in St. Louis purchased Treasury Bills in the last-named amount, maturing June 7, 1939, and deposited or left said bills with the First National Bank in St. Louis for collection at maturity, with instructions to place the proceeds to his credit in his checking account at said Bank, which was accordingly done. That for some years prior to 1939, said William G. Yantis had followed the same practice and no returns for taxation had ever been made by said William G. Yantis of the United States Treasury Bills for taxation or of the money used to purchase the same.

"The Commissioners further find that in directing and instructing the First National Bank in St. Louis to purchase the Treasury Bills aforesaid for his account, the said William G. Yantis did not acquire said Treasury Bills as an investment and that he did not receive any interest or income therefrom and his sole purpose was to evade the taxing laws of the State of Missouri, and that said transaction was a fraud upon the State of Missouri and the revenue laws thereof, and the same was illegal and invalid against the said State and a mere

illegal scheme and device and colorable subterfuge to evade his just and proper contribution to sovereignty for the protection, he and his property received through the instrumentalities of the State. The Commissioners find that the device and subterfuge of merely changing the relation between said William G. Yantis and the First National Bank in St. Louis from that of creditor and debtor to bailor and bailee was fraudulent, illegal and invalid and of right can and ought to be disregarded and deposit in said First National Bank in St. Louis assessed for taxation.''

Clearly the first two paragraphs, above set out, constitute the facts of the case and the third paragraph is mainly the conclusions of the Tax Commission as to the legal effect of the facts found. Therefore, the decisive question is whether the facts found show a valid legitimate ownership of non-taxable property, or show an illegal invalid scheme and device and colorable subterfuge to evade taxation. In short: was it a real purchase or a fake purchase?

Respondents contend that where ''such securities having been purchased with the sole intent of evading taxation, such action on the part of the taxpayer was fraudulent in law, and rendered the sum so converted subject to taxes''; that if ''money, subject to taxation, is temporarily invested in government securities, primarily exempt from [395] taxation, for the purpose of evading taxation, this is fraudulent as against the State''; and that ''money which is temporarily invested in such securities for the purpose of evading taxation is not exempt from taxation.'' In short, the basis of respondent's claim is that it is improper conduct on the part of the taxpayer to buy Government bonds shortly before June 1st without intending to own them for a considerable length of time. In fact, it is argued that, to be proper, bonds must be bought which will produce some income on the amount invested and not merely repay the principal. (Of course, relator's bank account did not produce any income either.) Respondents cite a number of cases, hereinafter discussed, from other states. It is significant that so many of those involving temporary ownership of United States securities arose soon after the Civil War when Federal securities in considerable amounts first became available and state revenue was principally raised by property taxes. The situation is very different now in view of the general wide spread investment in United States Bonds, as a result of the intensive selling campaigns on the basis of patriotic duty to finance two world wars, and when state revenues come mainly from sales taxes, income taxes, inheritance taxes, etc. Why should it be improper to buy United States bonds merely for safety of principal? Very recently there have been times when cost above principal (on open market) amounted to more than prospective income on some of those which paid interest.

We think that our own Court en banc (State ex rel. Orr v. Buder, 308 Mo. 237, 271 S. W. 508, 39 A. L. R. 1199) has properly stated

the question and correctly ruled the matter as follows: "Is there any fraud, actual of constructive, in holding property which is nontaxable in a way to avoid taxation? . . . There is no fraud in doing a lawful act. A man may change his residence to avoid taxation; he may change the form of his property by putting his money in nontaxable securities, or in the form of property which would be taxed less, and is not guilty of fraud. . . . One cannot be guilty of fraud by doing what he has a legal right to do. A court does not inquire into one's motives for doing a lawful act." We think this is the only sound answer and that it is the rule that must be followed in this case. [See also Board of Commissioners of City of Hoboken v. State Board of Taxes and Assessments, 107 N. J. L. 35, 151 Atl. 364 (Aff. 156 Atl. 377); Commonwealth v. Harris (Ky.), 118 S. W. 294; People v. Ryan, 88 N. Y. 142, 42 Am. Rep. 238; United States v. Isham, 84 U. S. 496, 17 Wall 496, 21 L. Ed. 728; Chisholm v. Commissioner of Internal Revenue, 79 Fed. (2d) 14, 101 A. L. R. 200 and annotation l. c. 204; 61 C. J. 173, sec. 130.] In other words, the rightful ownership of non-taxable property may avoid taxes but such an ownership does not evade taxes.

In Commonwealth v. Harris, supra, the Kentucky Court of Appeals, discussing a sale of taxable corporation bonds and purchase of United States bonds before the assessment date, said: "It is not the object of the statute to paralyze traffic in personal property, merely because assessment day is approaching. The commonwealth loses nothing by a bona fide transfer of property, although the transfer may be made just before assessment day, . . . . Whoever bought the bonds from the defendant, if he resided in this state and owned them on assessment day, should have listed them for taxation, and it is immaterial to the commonwealth whether the taxes on the bonds were paid by Harris or by his vendee. The United States bonds which he purchased with the money were not assessable in the hands of the person from whom he bought them, and therefore, it could make no difference to the state whether they were held by Harris or his vendor. The defendant had a right to sell his bonds in good faith, and he had the equal right to invest the proceeds in government bonds. Of course, if the evidence had shown that the defendant only made a pretended sale of his bonds for the purpose of hiding them and escaping taxation, undoubtedly they could be assessed in his hands as omitted property."

Our statute, Sec. 10940 (Mo. R. S. Ann.) R. S. 1939, makes liable for taxes for the ensuing year, "every person owning or holding property on the first day of June, including all such property purchased on that day." Therefore, the person or corporation selling the bonds to Yantis, if a resident of this state and still on June 1, 1941 the owner of the money received from him for the bonds, was the person made liable (by Sec. 10940) for the taxes thereon for

the ensuing year. Likewise, the person owning the bonds on that date was not liable for any tax thereon because no tax [396] could be assessed on them. Yantis could be liable, under the plain terms of the statute and our whole system of taxation of property, only if he were actually still the owner of the bank deposit on June 1, 1941 and not actually the owner of the bonds on that date. That could only be true if there were some strings attached to the deal by some understanding that it was not an actual purchase and sale but was in fact some other kind of transaction. Under the facts found, how can it be said that Yantis did not own these bonds? It is plain that not only are there no facts tending to so show but that the facts conclusively show the contrary. Here the only reason Yantis received money for these bonds, when he did, was because the United States Government had issued non-taxable bonds maturing so soon after June 1st, 1941. Certainly it was not illegal or improper to buy them because of that fact.

The controlling facts here are that Yantis, on May 26, 1941, bought $378,000.00 of United States Treasury Bills, which paid no interest, and were due on June 4, 1941, for which he paid full face value by check on his bank account; and that he then left them with the bank with instructions to collect them at maturity and deposit the proceeds in his account which was done on June 4, 1941. Thus there is no claim here (or basis for a claim) that these bonds still belonged to some one else and were loaned to Yantis, or were sold to him with any agreement or obligation to repurchase or to repay him the purchase price or any part thereof. (Nor is there anything to show whether or not Yantis bought Treasury Bills or Bonds during other months.) Clearly the fact is that, while Yantis bought bonds which matured on the 4th day of June, he looked only to the obligor of the bonds, the United States Government, for the payment of the amount provided therein to be paid. It is not contended otherwise. Therefore, he was the sole owner of these bonds on the first day of June 1941 and they were not taxable property. We must hold that this is a case of actual, bona fide, rightful ownership of non-taxable property on June 1, 1941 and that motives for such ownership are immaterial.

Respondents cite Mitchell v. Commissioners of Leavenworth County, 9 Kan. 344 (Aff. 91 U. S. 206, 23 L. Ed. 302) where Mitchell on the last day before the assessment date drew a check for his bank account payable to himself in United States legal tender treasury notes, which were non-taxable. He received these notes from the bank and placed them in a sealed envelope which he delivered to the bank. Three days later they were deposited again to his credit as a general deposit. (Although then non-taxable, they were demand obligations used as money.) An assessment was made for part of the amount converted into these notes and Mitchell sought to enjoin collection of taxes levied thereon. The Supreme Court of Kansas held that,

his motive being to escape the just burdens of taxation, a court of equity would not lend its aid for the accomplishment of any such purpose. The United States Supreme Court in affirming this decree of dismissal said: "a court of equity will not knowlingly use its extraordinary powers to promote any such scheme .as this plaintiff devised to escape his proportionate share of the burdens of taxation. His remedy, if he has any, is in a court of law." The proceeding in the present case is certiorari to quash the assessment record which is at law (State ex rel. St. Louis Union Trust Co. v. Neaf, 346 Mo. 86, 139 S. W. (2d) 958 and cases cited). and relator's claim is that the record on its face shows this assessment to be invalid.

Respondents also cite Holly Springs Savings and Ins. ' Co. v. Marshall County, 52 Miss. 281, 24 Am. Rep. 668, where a bank bought United States Bonds, just before time for tax assessments, in an amount equal to all of its capital stock not already represented by its non-taxable bonds and banking house, for the specifically expressed purpose of avoiding all taxation on its capital stock. In upholding an assessment for taxes, the court said: "We must not be understood as holding that government bonds are taxable merely because the motive for their purchase was to escape taxation. Neither do we intimate that they must be held for any particular time, or be brought with any intention of holding them for any period whatever. They may be bought solely because of their non-taxable character and disposed of at the very earliest practicable moment, and such purchase will not subject them to taxation. We confine ourselves to the point at issue, and limit our decision to the facts before us; and we declare that when the capital of a banking institution, used throughout the year in the conduct of its business, is converted for. a few days into government securities, for the express purpose of defeating the imposition of any or [397] .all taxes, such investment is colorable and fraudulent, and its capital remains taxable to the same extent and in the same manner as if such conversion had never taken place. In such case the tenure by which they were held, being a fraud and a cheat, will be disregarded, and the bankers will be considered as still the owners of that property which, for the moment, they have attempted to hide beneath the protection of the general government."

The first part of the above quotation clearly recognizes that it is not improper to buy government bonds for the purpose of owning non-taxable property and thereby avoiding or reducing property taxes. However, that case was a case of a corporation, a bank, seeking to avoid payment of any tax on its capital stock, which ·the court said would be "a too literal interpretation of the statute." (The Court strongly intimates such tax was intended to be in the nature of franchise tax.) The Court treated the transaction as a "sham" and "a mere representation of property temporarily con-

cealed," and, therefore, "colorable and fraudulent." In view of the nature of a bank, which has the funds of its depositors as well as the amount paid in for its capital, it might well be said that such an investment in bonds should be considered from depositors' funds instead of its own funds. Therefore, to claim the whole investment in bonds to be capital funds only, with the intent to escape any taxation at all thereon, could properly be held to be an attempted concealment and a sham. We think that the first rather than the last part of the above quotation is applicable to the case of an individual.

Jones v. Seward Co., 10 Neb. 154, 4 N. W. 946; Crowder v. Riggs, 153 Ind. 158, 53 N. E. 1019 and In re Peoples Bank of Vermont, 203 Ill. 300, 67 N. E. 777, also cited by respondents, are all cases of taxation of banks. In the Nebraska case, the proceeds of the sale of the bonds were taxable, for another reason, because under the statute a later date of assessment was applicable. In the Indiana case, there was likewise statutory authority for the assessment and also the injunction sought was denied because there was some taxable property omitted, the assessment of which was also included with what was to be enjoined. In the Illinois case, the transaction seems to have been regarded as not showing actual ownership because the bonds were never in the possession of the bank but were at all times held by a Chicago bank "distant from the situs of taxation." The court suggested that the bonds "may have subserved the same purpose for many like banking institutions, and thus repeatedly defrauded the state and municipalities of their proper taxes." In Whiting Finance Co. v. Hopkins (Cal.), 249 Pac. 853, and Whiting Finance Co. v. Hopkins (Cal. App.), 2 Pac. (2d) 461, the issue (under a statute authorizing deduction of loans in determining assessments) was whether or not the loans were bona fide loans. Several other cases cited by respondents concern transactions other than the purchase of United States Bonds. Moreover, we must rule this case upon the construction of our own statutes.

In Shotwell v. Moore, 129 U. S. 590, 32 L. Ed. 827, 9 S. Ct. 362, which respondents cite, the court upheld an Ohio statute providing for proportional assessment, so that holding Government securities for part of the year did not void all taxation of funds. The court said that "a State may make the ownership of property subject to taxation relate to any day, or days, or period of the year, it may think proper"; that "the statute in Ohio provides for the ascertainment of the monthly average amount or value of the property or goods in which such parties were dealing, and for the assessment for taxation on that basis"; that "the statute which does this does not tax the citizen for the greenbacks which he may have held at any time during the year, but taxes him upon the money, credits, or other capital which he has had and used, according to the average monthly amount he has so held"; and that "no principle . . .

forbids that State from taking the whole period of a business year already past as the best means of ascertaining how much the taxpayer shall be required to pay on property which is admitted to be taxable, and how much he shall deduct for the non-taxable securities of the State and of the United States.'' Missouri now applies the period method in assessing merchants taxes. (The highest amount of all goods . . . between the first Monday in March and the first Monday in June, Sec. 11305, R. S. 1939.) The Legislature has not seen fit to apply it to property taxes and neither the executive nor judicial branch of the Government may do so.

The record of said Board and Commission herein is ordered quashed. All concur except *Gantt, J.*, absent.