E. C. WOLCOTT, Plaintiff-Appellant, v. BYRON MOSER, Defendant-Respondent, No. 43171—262 S. W. (2d) 620.

Court en Banc, November 9, 1953.

Rehearing Denied, December 14, 1953.

444

*McDonald, Bartlett & Muldoon, Daniel Bartlett* and *John F. Hanlon* for plaintiff-appellant.

*Israel Treiman, Jacob M. Lashly, Lashly, Lashly & Miller* and *J. Marvin Krause* for defendant-respondent.

BARRETT, C.—In general the purpose of this action by Mr. E. C. Wolcott is to recover the reasonable value of his services, not to exceed $20,000, for assisting Mr. Byron Moser, between the dates of July 1, 1949 and February 1, 1950, in selling the controlling shares of stock in the Jefferson Bank and Trust Company. Upon the trial of the cause a jury returned a verdict in favor of the defendant and the plaintiff has appealed, urging that the trial court prejudicially erred in the admission of evidence and in instructing the jury. The defendant asserts, upon the pleadings and all the evidence, that the

plaintiff is not entitled to recover in any event and, therefore, the judgment should be affirmed.

Mr. Wolcott claimed and testified that in discussing the bank with Mr. Moser in July 1949 he was informed that it was for sale and that Mr. Moser gave him the exclusive right to sell the controlling shares of stock. Specifically Mr. Wolcott pleaded ▆▆ that on the 16th day of July 1949 Mr. Moser ''in writing, promised to pay to plaintiff compensation at the rate of $2.00 per share on all shares sold by defendant and defendant's associates upon acceptance by defendant and his associates of an offer procured by plaintiff for the purchase of said shares at $62 per share, and provided further that the said offer would be to purchase at least 11,250 of the 12,500 shares outstanding,'' the offer to be accompanied by a check equal to five per cent of the purchase price. It is then alleged that between the dates of January 21st and February 1st, 1950, Mr. Moser sold a buyer, Mr. Herzog and associates, procured by Mr. Wolcott, the controlling 10,000 shares of stock in the bank at $50 per share, $500,000, but refused to pay the promised commission.

▆▆ Even though Mr. Moser subsequently sold the bank to Mr. Herzog for fifty dollars a share we are not confronted with the application of the rule often involved in the real estate broker cases that '' 'if property is placed in the hands of a broker for sale at a certain price or upon certain terms, and a sale is brought about through the broker as a procuring cause, he is entitled to commissions on the sale even though the final negotiations are conducted through the owner, who in order to make a sale accepts a price less than that stipulated to the broker or terms more liberal than those the latter was authorized to accept' * * *.'' Taussig, Day & Co. v. Poleman, 360 Mo. 470, 228 S. W. (2) 722, 727. The appellant does not rely upon the applicability of that rule and he does not claim that his principal, Mr. Moser, revoked or terminated his employment in violation of the terms of their contract. 2 Restatement, Agency, Secs. 454, 455; Studt v. Leiweke, (Mo. App.) 100 S. W. (2) 30, 34. Furthermore, while Taussig, Day & Co. v. Poleman was a suit in quantum meruit and involved the broker's commission in the sale of this bank to Mr. Moser in 1944, it was neither tried nor presented upon the theories involved in this cause and is of importance here only in so far as it abstractly states the general rules. The appellant recognized and anticipated that under his evidence and the pleaded written contract his claim and right to the commission was dependent upon the express condition that he procure a purchaser at sixty-two dollars a share (Rosenblatt v. Multin, (Mo. App.) 222 S. W. (2) 587, 592; Hughes & Thurman v. Dodd, 164 Mo. App. 454, 146 S. W. 446; Tant v. Gee, 348 Mo. 633, 154 S. W. (2) 745; 2 Restatement, Agency, Secs. 446, 447, 448) and to avoid the force and effect of the express condition he alleged that Mr. Moser was guilty of fraud or bad faith which prevented his

performance of the contract and, by reason of that fact he was nevertheless entitled to the commission. 8 Am. Jur., Sec. 141, p. 1066; Feinstein v. Glick, (Mo. App.) 116 S. W. (2) 141, 144. "However, even though the broker's contract of employment makes his right to commission dependent upon obtaining a sale upon a fixed price or within a fixed time, the owner cannot defeat his right to commission if he is guilty of any fraud or bad faith which prevents performance by the broker in accordance with his contract." Bowman v. Rahmoeller, 331 Mo. 868, 879, 55 S. W. (2) 453, 458.

In his original brief appellant's counsel assert that defendant promised the commission and represented that in no event would he sell the bank for less than sixty-two dollars a share and that "from the very moment defendant so agreed with plaintiff, defendant was acting fraudulently and in bad faith" with respect to the representation "with the fraudulent intention of obtaining and using plaintiff's services in procuring a purchaser of the stock so that defendant could then sell to such purchaser at a lesser price and thus defraud plaintiff of his right to a commission under the terms of the * * * agreement; that pursuant to said fraudulent scheme" and notwithstanding his representations the defendant secretly negotiated with Mr. Herzog and sold the stock for fifty dollars a share, thus preventing plaintiff's performance and entitling him to recover in quantum meruit. But in his reply brief, where the subject of submissible case is treated, appellant's counsel assert that they have no quarrel with the rule of law relied upon by the respondent that if the broker's contract makes his right to a commission conditional on a sale at a fixed price he is not entitled to a commission for sale at a lesser price, because the evidence "*demonstrates* * * * *that* * * * *plaintiff* (did) make a prima facie case in showing that *plaintiff was prevented from performance of his contract* (never terminated) by defendant's fraud and bad faith, * * *." The plaintiff's cause of action is set forth in five separately numbered paragraphs and the allegations as to fraud and bad faith, which were also hypothesized in the principal instruction, are as follows:

"4. *That defendant was guilty of fraud or bad faith which prevented plaintiff from performing in accordance with his agreement* with defendant hereinabove set forth in paragraph 2, in the following particulars:

"(a) In that defendant falsely and fraudulently represented to plaintiff at the time plaintiff and defendant entered into the agreement set forth above in paragraph 2 hereof and thereafter until the said sale was consummated; that defendant would not under any circumstances consider the sale of said stock for less than $62 per share, with the fraudulent intention of obtaining and using plaintiff's services to procure a purchaser of the stock so that defendant could sell to such purchaser at

a lesser price and thus defraud plaintiff of his right to a commission under the terms of the said agreement between plaintiff and defendant; that pursuant to said fraudulent scheme, defendant did, in fact and notwithstanding his representations to plaintiff that he would not under any circumstances sell the stock to anyone for less than $62 per share, sell the said stock to a purchaser procured by plaintiff for $50 per share.

"(b) In that *defendant in bad faith negotiated unknown to plaintiff with a purchaser* (procured by plaintiff) of the aforementioned stock for the sale of said stock at a lesser price than that which defendant had told plaintiff was the minimum price for the stock, and on one occasion directed plaintiff not to appear at such negotiations with the intent and purpose of (1) *preventing performance by plaintiff in accordance with the terms of the aforementioned agreement between plaintiff and defendant* and (2) cheating plaintiff of compensation for his services."

The agreement and written promise alleged in the petition turned out to be two letters from Mr. Moser to Mr. Wolcott dated July 16th, 1949. One of the letters was so written that it might be shown to prospective purchasers, but as to the terms of a sale and the payment of a commission the contents of the letters were essentially identical. The one not written for the benefit of prospective purchasers said: "Dear Mr. Wolcott: If a deal is made, in keeping with my letter to you under date of July 16, it is understood that you will receive a payment of $2.00 per share, if we accept an offer of $62.00 a share; in other words, no deal can be made unless my associates and I receive $60.00 a share net, with whatever signed agreement is necessary to make it clear to my associates that there will be no claim of any kind made on them for any payment other than the $2.00 a share, thus leaving everybody $60.00 a share, net. I think I have made it clear to you that you have no authority to offer the bank for sale to anyone at any price, it being clearly understood that all I am willing to do is to consider an offer, provided that the offer is backed up with a check equal to 5% of the suggested purchase price."

After receipt of the two letters and after his prior conversation with Mr. Moser, in which he was given the exclusive agency to sell the bank and it was represented that under no circumstance would the bank be sold for less than sixty-two dollars a share, Mr. Wolcott immediately set out to find a purchaser. He first got in touch with two groups, one from Chicago, but because of the bank's location and, for one reason or another, they were not interested in this bank, and he reported the fact to Mr. Moser. Then he turned to Mr. Rehme and Mr. Swan and they had a local group who were interested in buying the bank. The three of them attempted to sell the bank to that group for sixty-two dollars a share but the price was considered

too high, and finally Mr. Rehme and Mr. Swan, on behalf of that group, made Mr. Wolcott an offer of fifty-seven dollars a share. Mr. Wolcott said that he told Mr. Moser about this latter group and explained "that there would be some delay because they had to discuss it among theirselves." He expressed the opinion that they would not pay more than fifty-seven dollars a share and Mr. Moser said "if they appear" or make such an offer he would raise the price. Mr. Wolcott and his associates attempted to persuade this group that sixty-two dollars was a reasonable price but their spokesman said, "No, that price is too high, and we will quit." Then in September, according to Mr. Wolcott, he got in touch with a lawyer whose client, Mr. Herzog, was interested in buying a bank. Mr. Swan also represented Mr. Herzog and his associates in finding a bank for sale. There were numerous conferences and discussions between Mr. Wolcott, Mr. Rehme, Mr. Swan, the lawyer and Mr. Herzog concerning the sale of the bank, the principal effort being to sell the bank to Mr. Herzog for sixty-two dollars a share. Finally, Mr. Wolcott said, "I couldn't see any possibility of going any further, that was the price." At their final conference, probably in October, it was agreed that Mr. Wolcott was to arrange a meeting between Mr. Herzog and Mr. Moser, and he reported the fact to Mr. Moser but heard no more of the matter until the latter part of January when Mr. Rehme informed him that the bank had been sold to Mr. Herzog and his associates for fifty dollars a share. Mr. Wolcott immediately called Mr. Moser on the telephone, with Mr. Rehme listening to the conversation on an extension, and "he said the negotiations were the kind, there was a lot of stockholders in the bank, and the deal was being closed, and I said 'Shall I come right over?', and he said 'No, there is nothing you can do, and I'll call you.'" The contract for the sale of the bank to Mr. Herzog for fifty dollars a share was executed on the 21st day of January 1950.

In connection with this phase of the case it is assumed that there was no substantial change in the "bank structure" between the dates of Mr. Moser's letters to Mr. Wolcott, July 16, 1949, and the date of the sale to Mr. Herzog, January 21, 1950. Prior to July 16th the quoted "book value" of the bank was fifty dollars a share. According to Mr. Wolcott the value of sixty-two dollars a share was arrived at by adding "one per cent of the deposits * * * and that was nine dollars." Then, there was "The property on the place, the bookkeeping machines and the general equipment set up in the bank, and he figured that was five dollars a share." Along with the good will of the bank there were other intangibles and, of course, the two dollars a share commission. In the letter to be shown prospective purchasers Mr. Moser mentioned the bank's net earnings "which are considerably above the average earnings for all of the downtown banks in St. Louis." He said, "In other words, we have a little gold mine in the Jefferson Bank, and

were it not for certain things I have in mind, I would not think of selling my interest at any price.'' ·

Even though Mr. Herzog had known Mr. Moser for several years, it is a fair and reasonable inference from the plaintiff's evidence that he was interested in buying a bank, that Mr. Wolcott and his associates first informed him of the fact that the bank was for sale and attempted to sell it to him for sixty-two dollars a share. Nevertheless, Mr. Wolcott did not procure a purchaser at the stipulated, conditional price, and it may be that this fact alone is sufficient to dispose of this appeal, as the respondent contends. Rosenblatt v. Multin, supra; Hughes & Thurman v. Dodd, supra; Tant v. Gee, supra.

But the appellant insists that there were circumstances which demonstrate a prima facie case and from which the jury could find that he was ''prevented from ▉▉▉ performance of his contract * * * by defendant's fraud and bad faith.'' He points to certain improbabilities and inconsistencies in Mr. Moser's testimony which he says manifest studied concealment and a lack of frankness evidentiary of fraud. For example in July Mr. Moser told Mr. Wolcott that he was interested in buying another downtown bank and wrote the letters offering to sell and in the same letters stated that the bank was not for sale. When he did sell in January he wrote the stockholders that he was going ''to retire from active business,'' and the following April wrote letters inviting friends to buy stock in another bank in which he had become ''retired chairman of the board.'' He says that on one occasion—the occasion of the telephone call in January—Mr. Moser directed him not to appear at the negotiations leading to the sale of the bank. He points to the fact that the broker brought the buyer and seller together and to the continuing representation that the defendant would not under any circumstance consider an offer of less than sixty-two dollars a share. And finally, he says, ''In all of the record in this case there is not one scintilla of evidence to explain why Moser told Wolcott that he would not under any circumstances consider an offer, not only such as might be procured by plaintiff but from anyone, for less than $62 per share and then accepted an offer from the buyer procured by Wolcott for $50 per share.'' It would serve no useful purpose to analyze these circumstances in detail and indicate the permissible inferences, whatever inferences may be drawn from these additional circumstances with respect to fraud, they certainly do not tend to prove as the plaintiff alleged and hypothesized ''that *plaintiff was prevented from performance of his contract* * * * by defendant's fraud and bad faith.'' In Gibson v. Pleasant Valley Development Co., 320 Mo. 828, 8 S. W. (2) 828, the broker, in his suit for a commission, ''states that he was prevented by the defendants from completing the same,'' a sale for $575,000. There were other factors in the case, but as to this precise problem the court said, ''The sale to Elledge for $450,000 no doubt occurred because Elledge had

become previously interested in the property through plaintiff's efforts. But the plaintiff does not sue for commission on that sale. He does not claim that he procured a purchaser at that price. The petition sounds upon a breach of contract and *quantum meruit for services rendered in performance of the contract*. He seeks to recover solely upon the ground that he was prevented by the defendant from causing a sale of the property to Elledge for the price mentioned in his contract, or for any other sum which would realize to McKee or the Pleasant Valley Development Company $475,000. He claims he rendered services in the performance of *that contract*, and that he was prevented by the defendant from consummating it. There is not a scintilla of evidence to show that he had any prospect of carrying out that contract. The evidence conclusively shows that he could not have made that sale to Elledge and his syndicate for any price authorized by the contract.'' It is not necessary to consider whether there were other errors upon the trial of the case and the judgment is affirmed accordingly.

PER CURIAM:—In a supplement brief filed in Banc, plaintiff thus argues his contention that he was prevented ·by defendant from performance of his contract: ''We think it plain that when defendant sold his stock for $50.00 a share directly to the buyer procured by plaintiff, defendant unquestionably kept from occurring and rendered impossible plaintiff's performance under an unterminated agreement calling for sale at $62.00 per share.'' What this argument means is that a man who made such a contract could never sell to anyone ▆▆▆ at any price because, according to plaintiff, if he did he would be preventing plaintiff from ever being able to perform his contract. In other words, he would make it impossible for plaintiff to perform by disposing of the subject matter of the contract, and, regardless of whether plaintiff ever could have performed, that would be preventing his performance and give him a right to compensation. What this argument overlooks is that plaintiff and defendant made a valid contract, under which plaintiff was only entitled to compensation if he procured a buyer at the price stated. Plaintiff has not sought to set this contract aside or made any claim that he had any other contract; nor brought an action for damages for fraud and deceit. He was not entitled to any compensation unless he could perform the contract he made. Thus it is obvious that plaintiff's argument, about defendant preventing his performance, is erroneous.

Plaintiff's further contention, that he has a right to compensation on the theory that defendant entered into the contract with fraudulent intention of using plaintiff's services to find a purchaser to whom he would sell at a lower price, is just as erroneous. Defendant had the right to make such a contract and to hold plaintiff to it. Plaintiff did not have to make such a contract but he did accept it and was unable to perform it. He does not claim he ever had any different con-

tract. In his reply brief in Banc, plaintiff says: "We do contend that the facts in evidence afford a basis for a reasonable inference that Moser (defendant), when ·he made statements that $62.00 was his lowest price to anybody, never expected to receive such a price but at all times had in mind selling at a more realistic price just as soon as Wolcott (plaintiff) found him an interested buyer, and that Moser made these representations to Wolcott of his intention for the purpose of procuring the services of Wolcott in finding a buyer with whom Moser could deal without the burden of paying for the finder's services." This argument means that a man who makes such a contract (which he has a right to make) cannot hold the other party to it and, although the other party is unable to perform it, cannot deal on different terms with anyone with whom the other party attempted to deal at the contract price. Of course, this would defeat the only purpose of making such a contract. Certainly, an intention to hold a party to the terms of a valid contract could not be fraud. We have said: "A court does not inquire into one's motives for doing a lawful act." (See State ex rel. St. Louis Union Trust Co. v. Hoehn, 351 Mo. 382, 173 S. W. (2d) 393.) We think this principle applies to making a lawful contract that a party has a legal right to make.

Plaintiff cites Bowman v. Rahmoeller, 331 Mo. 868, 55 S. W. (2d) 453. However, in that case, we said: "The question of when a broker is entitled to a commission depends upon his contract. * * * If the broker's contract makes the right to commission conditional on a sale at a fixed price or within a definite time, he is not entitled to a commission for sale made at a less price or after such time." We noted the only exception, as "the owner cannot defeat his right to commission if he is guilty of any fraud or bad faith which prevents performance by the broker in accordance with his contract." In the Bowman case, there was evidence of a conspiracy between the buyer and the seller to conceal their negotiations from plaintiff to avoid paying him a commission. Nevertheless, in the Bowman case, we reversed the plaintiff's judgment for the commission, and remanded the case for a new trial, because the defendant had the right to have an instruction that plaintiff was not entitled to recover any commission if the jury found that his contract made his right to compensation conditional upon a sale within a definite time. Of course, the same thing is true of a contract making the right to compensation conditional on a sale at a fixed price, as held in Gibson v. Pleasant Valley Development Co., 320 Mo. 828, 8 S. W. (2d) 828. The trouble with plaintiff's case is that he could not perform the contract he made and could not show that he was the efficient procuring cause of a sale at any other price. (See Barnum v. Hutchins Metal Products, (Mo. Sup.), 255 S. W. (2d) 807; Real Estate Enterprises v. Collins, (Mo. App.), 256 S. W. (2d) 286; Kyle v. Kansas City Life Ins. Co., 356 Mo. 331, 201 S. W. (2d) 912.) Therefore, with this explanation of the contentions

in plaintiff's supplemental briefs, the opinion of Barrett, C. in Division 2 is adopted as the opinion of the Court en Banc; and the judgment is affirmed. All concur.