TAUSSIG, DAY & COMPANY, INC., a Corporation, and JOHN T. ABELES, Respondents, v. THOMAS T. POLEMAN, Appellant, No. 41278—228 S. W. (2d) 722.

Division One, April 10, 1950.

*C. Kenneth Thies* and *Barksdale, Abbott & Thies* for appellant.

*McDonald, Bartlett & Muldoon, Daniel Bartlett* and *Jŏhn F. Hanlon* for respondents.

472

HYDE, J.—Quantum meruit action for plaintiffs' services in assisting defendant to acquire the controlling interest in the Jefferson Bank & Trust Company of St. Louis. The Court (jury waived) entered judgment for plaintiffs for $15,408.67 ($12,885.30 for commission, with $2523.37 for interest) and defendant has appealed.

According to plaintiffs' evidence, in February 1944, Mr. Joseph L. Rehme, Vice-President of Taussig, Day & Company, brokers, learned from Mr. O. H. Moberly, President of the Jefferson Bank that a controlling interest in the Bank could be bought. Mr. Moberly suggested a price of $175.00 per share (there were 2000 shares) and a year's salary ($7500.00) to him for resigning. Mr. Rehme began

to look for prospects and in April submitted a proposal for acquisition of the Bank to defendant, giving him detailed information about its financial condition. Defendant finally said that he would not pay more than $125.00 per share and the matter was then dropped. In May, Mr. Rehme talked to Mr. John T. Abeles, also a broker, about the situation and they agreed that they would work together and divide equally any commission received. In June, Mr. Abeles produced as a prospect Mr. Byron Moser, who was then President of the Mutual Bank & Trust Company of St. Louis. After Rehme had given Moser information about the Bank, he was asked to submit a bid of $160.00 per share. Rehme did this but Moberly said that he would not recommend less than $175.00 per share. Thereafter, on July 3, 1944, Moser sent Rehme a written proposal to purchase up to 1905 shares (with a minimum of 1250) at $175.00 per share, with a $7500.00 bonus to Moberly, $5000.00 earnest money and commissions to be paid by sellers. Moser said he was interested on behalf of a group of friends and signed the letter as ''Agent.'' Moberly refused to consider this offer with only $5000.00 earnest money.

Another proposal was made by Rehme to Moberly on August 3, 1944, which increased the bonus to Moberly to $10,000.00, and provided for a 5% commission to be paid by the sellers. Moberly then made it plain that the sellers would pay no commission. Rehme and Abeles thought Moberly had understood in June that the sellers would be expected to pay a 5% commission and Moser had been proceeding on that assumption. Thereafter Moser agreed on a 2½% commission with Rehme and Abeles. In a letter of August 24, 1944, making suggestions for a new proposal, he stated that he would recommend to his principals ''two and one-half per cent commission on all stock purchased at the price of $175.00 per share.'' This was repeated in his letter of September 12, 1944 and was supplemented by a letter the next day in which he said: ''I hereby personally agree, in consideration of your efforts to purchase said stock for my principals, to pay you a commission of two and one-half per cent of the purchase price on all stock purchased at $175.00 per share.''

During part of August and September, Moser was in Chicago but there was considerable correspondence between him and Rehme about the deal. Rehme was also negotiating with Moberly who wanted $50,000.00 earnest money. Moser offered $9,000.00 but they finally compromised on $25,000.00. When Moser returned to St. Louis the proposal of September 12th was made which provided for that amount. Defendant had agreed to go into the deal with Moser and was furnishing it. Rehme and Abeles did not know defendant was in the deal with Moser until then. There was conflicting testimony as to when defendant became interested with Moser but there was a substantial basis (from his admissions) for finding that he

was in the deal with him before September 1944. The proposal of September 12th was for $175.00 per share up to 1500 shares and $150.00 for all shares over 1500. It also contained the following condition: "2. If at least 1,138 shares are not deposited or definitely committed for in writing by Saturday, September 16, the $25,000.00 deposited in escrow is to be returned to me, without obligation to anyone. My liability at any time is not to exceed $25,000.00. I am to have the right to purchase less than 1,138 shares if this number is not available." This condition was not met (the $25,000.00 deposit was never made) but during the next two and a half months, the attorneys for the parties worked out a contract in accordance with this September proposal.

One difficulty which caused much of this delay was that Moberly informed Rehme that it would be necessary to get the approval of the Federal Reserve Bank for the new management of the Bank, as it was a member of the Federal Reserve System. Up to that time, Moberly had not been informed who the prospective purchasers were. Thereafter, there were several conferences with representatives of the Federal Reserve Bank and Rehme, Abeles and defendant's attorney. Moser also personally took up the matter with the President of the Federal Reserve Bank. The position of the Federal Reserve officials was that, while they had nothing to say about who might purchase the stock of a bank, they would have something to say about the management; and that it would be wise to get approval before making an investment. Abeles claimed that he planned the conference with the Federal Reserve officers which quieted their opposition to defendant as a purchaser. Early in December 1944, the proposed contract had been completed and was submitted to the directors of the Bank by Moberly. They turned it down; they did not state any reason for rejecting it, but by that time they apparently thought they could get a better price than $175.00 per share and they particularly did not like the price of $150.00 for all stock over 1500 shares.

Thereafter, defendant undertook to buy as much stock as he could from individual stockholders; but Moser said that he was withdrawing because he was only interested in buying a controlling interest. By the middle of February defendant had acquired 513 shares which gave him a one-fourth interest. 343 of these shares were purchased by defendant from the Mercantile-Commerce Bank & Trust Company at $180.00 per share on February 5, 1945. Defendant had previously authorized Rehme to offer $150.00 for this stock but was unable to buy it at that price. Defendant claims that the Mercantile-Commerce would not sell to Rehme. Anyhow, final negotiations for this purchase were made by defendant directly with the Mercantile-Commerce. Rehme said that prior to the purchase from the Mercantile-Commerce he told defendant that the stock was

worth $200.00 to $210.00 per share and that he would like to propose the deal to other prospects who would pay a price more commensurate with its value; but that defendant said: "You are my agent in this thing, you can't walk out on me now;" and that he begged him to stay with him. Defendant finally authorized Rehme to buy all the stock he could at $180.00 per share. Rehme wrote letters to all stockholders of the Bank and called on many of them personally (defendant drove him around to see them) but was only able to buy 10 shares at this price. In the meantime the directors formed a stockholders' pool, agreeing to act as a group and not sell their stock individually. In an effort to break the pool, defendant did authorize Rehme to offer one large stockholder $200.00 per share, and then increased it to $210.00; but when it was not accepted he continued his efforts to buy from others at only $180.00.

On March 2, 1945, defendant suggested to Rehme and Abeles that they should "lay off" the deal for thirty or forty days and they asked for a definite understanding concerning their compensation if they did so. They stated that each of them had other prospects to whom they might sell the Bank. They said that defendant should pay them 2½% on the price of stock already acquired, 2½% on the price of any stock that he might in the future acquire at $180.00 per share, and 2½% of such price if anyone else bought the stock during the period in which they were to "lay off" at his request. Defendant said: "That sounds like black-mail", and walked out of the meeting. However, they said that Moser (who was present advising defendant) then told them not to leave defendant and said he would be fair and reasonable, explaining that defendant had been under a nervous strain because of illness in his family.

Rehme said that he continued to try to buy some of the odd shares that were not in the pool; that he called defendant in April and asked him what his intentions were; that defendant told him he would be out of town a week or two but would discuss it when he got back; and that Moser told him defendant wanted to go through with the deal and said several times he would see that defendant paid them fair and reasonable compensation. Finally, early in June 1945, Moser told him that defendant had bought the balance of the stock. Defendant had made a buy or sell offer at $210.00 per share and the directors agreed to sell. Rehme said he called defendant at once and was told to see him after June 20th when the deal was to be closed; but when he did see him, defendant refused to pay him. Defendant sold the stock to Moser in 1947 and, at the time of the trial, Moser was President of the Bank.

Defendant's version of the commission agreement was that plaintiffs were to receive 2½% commission on only the stock they bought at the authorized price. (At first $175.00 per share; later increased to $180.00.) Defendant said that neither Rehme or Abeles, prior

to the March 2, 1945 meeting, had ever made any request for commission on the stock he had acquired up to that time. Both defendant and Moser said that there was no discussion of commissions between September 12, 1944 and March 2, 1945. The parties all agree as to the demands that were made on March 2nd. Defendant claimed Rehme was only entitled to $45.00, being 2½% on the purchase price of ten shares he personally bought under his 1945 authorization from defendant to buy any shares he could at $180.00 per share. Defendant said he offered him this amount in June 1945, and it. was tendered in this case. Other facts (shown by this record of about 1400 pages of testimony and exhibits) material to the questions raised will be hereinafter stated.

 We think defendant takes too narrow a view of the situation and that the evidence reasonably supports a finding that at all times what was contemplated was not merely purchase of bank stock but the purchase of a controlling interest in the Bank. That was the only thing in which Moser was ever interested and that was what defendant sought when he became interested with him. When Moser withdrew from the deal after the rejection of their offer in December 1944, what defendant still wanted to accomplish was the purchase of control. He sought to reach this result by a different method, namely to acquire as much stock as possible from individual stockholders and thereby have a voice in the affairs of the Bank which would aid him in negotiations with the directors for the stock they controlled in their pool. Rehme was very active in assisting him in these efforts. After he had acquired a one-fourth interest, Rehme said defendant told him that "things are under control"; that he had "the directors over a barrel"; that "we will buy this stock at 180 per share before we get through with it"; and that defendant said "you got to stay with me Joe and see this thing through." Of course, defendant's version is different but plaintiffs' evidence was not unreasonable and the matter of credibility was for the trial judge who saw the witnesses.

 All the evidence shows that plaintiffs·brought the deal to the attention of defendant and Moser and that they were employed by them to negotiate the purchase. Defendant, however, contends that he was not in the deal prior to September 1944 and that it was· error to admit evidence of what was done before that time. As we have noted, there was evidence from which the court could have found that defendant was in the deal earlier. In any event, it was relevant to show the beginning. of the transaction, how it was developed and its status when defendant came into it. All the negotiations were properly considered as a part of one single transaction· for purchase of a controlling interest in the Bank. They were not separated into several distinct parts or deals and evidence as to·all of the negotiations was necessary to· an understanding of plaintiffs' ver-

478

sion of the case. We, therefore, hold that the court properly considered this evidence.

■ Defendant's main contention is that plaintiffs were not the procuring, efficient and producing cause of the sale because their agency was terminated on March 2, 1945. Defendant's brief says: "Virtually, the sole question in this case has to do with how far must a principal go along with agents, after repetitious failures by the agents, before the principal has any right of severance, and revocation of his agent's authority." Defendant lists these failures, prior to March 2, 1945, as follows: "Misrepresenting that the sellers were to pay the commissions; inducing the appellant to come into the transaction on the representation that the stock could be .acquired at $175.00 per share, which proposal was rejected on December 5, 1944; failing to revive negotiations with the principal stockholders in late December 1944 and early January 1945; refusal by the Mercantile-Commerce to even discuss the matter with respondents and advising respondents that 'price is not the only consideration, there are other factors'; attempting to buy the stock at an increased authorization of $180 per share and acquiring only ten shares; failing to buy the stock at the increased authorization of $190 per share; failing to buy the stock at the increased offer of $200 per share; failing to buy the stock at the increased authorization of $210 per share."

These alleged failures overlook the changed situation after the directors formed a stockholders' pool, when defendant's efforts (in which he was very actively assisted by Rehme) were not directed toward negotiation but to break the pool by buying stock from some of those in it; by which means, defendant sought to accomplish his main objective of acquiring a controlling interest. Plaintiffs were originally employed to make the purchase of ■ this interest in the summer of 1944, with a definite contract as to their compensation, after Moberly had made it plain that the owners of the stock would pay no commission for a sale. It is true that the price then contemplated was $175.00 per share. However, when the pool was formed, defendant increased this to $180.00; and finally, when no more stock could be bought at that price, did authorize Rehme to offer as high as $210.00, which was the ultimate purchase price of the controlling interest. It is the law, as held in Kyle v. Kansas City Life Ins. Co., 356 Mo. 331, 201 S. W. (2d) 912, and other similar cases cited by defendant, that, to be entitled to a commission for a consummated sale (or purchase as here), the broker must have been the efficient cause thereof, procuring the other party to the deal. (See also A. L. I. Restatement of Agency, Sec. 448.) It is likewise the law, as held in Bowman v. Rahmoeller, 331 Mo. 868, 55 S. W. (2d) 453, and authorities therein cited, that "if the broker's contract makes the right to commission conditional on a sale at a fixed price or within a definite time, he is not entitled to a commission for sale made at a less price or after such

time''; but as also stated therein ''even though the broker's contract of employment makes his right to commission dependent upon obtaining a sale upon a fixed price or within a fixed time, the owner cannot defeat his right to commission if he is guilty of any fraud or bad faith which prevents performance by the broker in accordance with his contract.'' (See also Restatement of Agency, Sec's. 446, 447 and 454.)

Likewise ''the rule is well established that if property is placed in the hands of a broker for sale at a certain price or upon certain terms, and a sale is brought about through the broker as a procuring cause, he is entitled to commissions on the sale even though the final negotiations are conducted through the owner, who in order to make a sale accepts a price less than that stipulated to the broker or terms more liberal than those the latter was authorized to accept''; and ''this rule applies where the broker sends his customer direct to the owner who carries on the negotiations himself.'' (8 Am. Jur. 1101, Sec. 191; Annotations 43 A. L. R. 1104, 128 A. L. R. 430; 12 C. J. S. 196, Sec. 86 b, p. 215, Sec. 93.) It is, of course, also the law, as defendant contends, that a principal may terminate an agency which is indefinite as to duration at least after giving the agent a reasonable time to affect a sale or purchase. (Staroske v. Pulitzer Publishing Co., 235 Mo. 67, 138 S. W. 36; La Force v. Washington University, 106 Mo. App. 517, 81 S. W. 209; Graf & Case Realty v. Lovell, 180 Mo. App. 706, 163 S. W. 877; See also Restatement of Agency Sec's. 118 and 450-454.) Defendant argues that plaintiffs' agency was terminated on March 2, 1945. However, we think the Court could reasonably have found that there was no intention on the part of defendant to terminate plaintiffs' agency at that time.

Defendant's own testimony about this was: ''I said it seemed to me that the best thing to do was to let it alone for a little while, everybody out there was all steamed up. We had tried to break up that pool and we couldn't. I felt the best thing to do was to just let them completely alone, let everything quiet down, and then go back later on and talk to them.'' He did not say to anyone that this was the termination of plaintiffs' agency. Moser, who was present at the meeting, gave a similar account as to what defendant said; and according to Abeles and Rehme, Moser remained after defendant left and urged them not to abandon the deal. We think it was a reasonable view of the evidence for the trial court to find that plaintiffs developed the deal, brought it to defendant's attention and carried on the negotiations and other activities requested by defendant to the point where the owners were willing to sell at a price which defendant finally accepted; that plaintiffs' employment was never terminated and that there was never a complete break in the negotiations but that each party to the deal was trying to wait out the other; and that in 1945 defendant accepted and desired plaintiffs' services to enable

him to buy control at the best figure satisfactory to him. Thus it seems reasonable to find that, while the deal started as an attempt to buy at $175.00 ▆▆ per share, it changed after December 1944, with defendant's price increasing to meet the new conditions and plaintiffs' contract was not thereafter at least conditional on purchase at a fixed price or within a definite time. Certainly we cannot hold that such a view of the evidence is "clearly erroneous." (See Sec. 847.114d, Mo. R. S. A.) We, therefore, hold that the finding in favor of plaintiffs for compensation as the efficient procuring cause of the transaction must be sustained.

▆▆ Defendant makes the further contention that plaintiffs should not be entitled to compensation because they acted in bad faith during part of the negotiations. This is based on evidence that Rehme told one stockholder (Mr. Norris) that he could get a higher price by waiting; and also that Abeles and Rehme threatened to make a sale to other prospective purchasers if defendant did not agree to the commission arrangement they proposed on March 2, 1945. As to the latter we do not construe the record as necessarily showing a threat but rather an expression of fear that plaintiffs would lose their commission if some outsider would buy the directors' stock during the period in which defendant proposed they be left alone. It was more in the nature of argument against the course defendant suggested and we hold that the trial court could reasonably find that it was not bad faith. Likewise, the Norris incident does not conclusively show bad faith. This only involved four shares and at the time defendant had acquired a one-fourth interest. Norris later signed a letter which indicated that he would have sold these shares at $185.00 but stated that Rehme told him it would be better to wait and that by doing so he could get a better price. Rehme testified that Norris talked to him (in a telephone conversation) about the sale of stock owned by his sister, a nun in a convent, and was not ready to sell at that time, but told him he wanted to obtain the highest price that would be paid to anybody. Rehme said that he told Norris he did not know what the highest price would be and couldn't advise him. The statements Norris made as a witness were not as positive as those in the letter (he did not prepare the letter and said it was not accurate) and he said he could not have delivered the stock at the time he talked to Rehme. We think the trial court was justified in finding there was no merit in this contention.

▆▆ Defendant further contends that the judgment is excessive and we think it is. We think it clearly appears that the parties had an agreement for 2½% commission and that this was never changed. Plaintiffs' claim that under paragraph 2 of Moser's letter of September 12, 1944 (hereinabove quoted) there was no agreement as to the amount of commission after September 16th. This is just as unreasonable a construction as defendant's claim that the commission only ap-

plied to shares personally purchased by Rehme. In the first place, reading this paragraph as a whole it is plain that it was intended to apply to the earnest money deposit and liability to the sellers. It had nothing to do with commission which was referred to in paragraph 14; the last paragraph of the letter. Of course, everyone understood that commission was only to be paid for accomplishing the result sought. Second: Plaintiffs were not satisfied with what this letter said about commission and got a new and separate letter from Moser the next day, about commission only, in which he agreed to pay 2½% commission. Third: The parties went ahead all during the fall of 1944 to work out a contract on the basis of the September 12th proposal, delayed mainly by opposition of the Federal Reserve officers. Fourth: At all times, thereafter, until after the deal was finally made by defendant in June 1945, plaintiffs' only claims were for 2½%. That was still the amount they asked at the meeting on March 2, 1945. Rehme admitted that he never indicated any change in position as to rate of commission at any time after September 12, 1944 until late in ·June 1945, after defendant repudiated the agreement. Abeles made the same admission in his deposition.

It is true that both Rehme ·and Abeles said they had many conversations with defendant and Moser during that period about the basis of their commissions, but ▮▮▮▮ there is no substantial evidence that the rate was ever considered by anyone to be more than 2½%. It is significant that throughout that period whenever plaintiffs stated a rate that was the rate they stated. Our conclusion from the whole record is that any claim for more than 2½% was an afterthought by plaintiffs, decided upon when they contemplated bringing this suit. We, therefore, hold that plaintiffs are entitled to a commission of only 2½% of the whole amount of the purchase price. Both parties agree this was $360,720.00. Therefore, plaintiffs are entitled to judgment for $9,018.00, with interest at 6% from June 22, 1945.

The judgment is reversed and the cause remanded with directions to enter a new judgment for this amount. All concur.