Clyde L. MARTIN, Respondent,

v.

MERCANTILE TRUST COMPANY, a Corporation, Appellant.

No. 44821.

Supreme Court of Missouri.

Division No. 2.

July 9, 1956.

Motion to Modify Opinion Denied Sept. 10, 1956.

Thompson, Mitchell, Thompson & Douglas, James M. Douglas, John O. Hichew, William G. Guerri, Robert K. Larson, St. Louis, for appellant.

J. L. London, Joseph J. Howard, Samuel B. Murphy, St. Louis, for respondent, Cook, Fairfield, Howard & Murphy, St. Louis, of counsel.

EAGER, Presiding Judge.

This is an action in quantum meruit by a real estate broker to recover for services which he claims were the procuring cause of the sale of the Mississippi Valley Trust Building in the City of St. Louis. The Mississippi Valley Trust Company and the Mercantile Commerce Bank and Trust Company were consolidated, effective August 31, 1951, and thereby became the Mercantile Trust Company, the present defendant; by reason of the consolidation, the building was no longer needed for bank purposes. Defendant entered into a contract on May 8, 1952, for the sale of the building for $1,600,000. Plaintiff alleged that he was the efficient and procuring cause of this sale. Defendant denied this claim in its entirety, and alleged that plaintiff was a mere volunteer, that he had abandoned his efforts to sell the building, and that a waiver of all right to commissions, made by the brokers who were actually handling the matter at the time the contract was executed, was binding on plaintiff. A verdict was returned in favor of plaintiff for $44,800, including interest.

Plaintiff's claim is actually based on the fact that he first contacted and worked with a brokerage firm in Hoboken, New Jersey, namely, C. B. Snyder Realty Co., and that the sale was eventually made through it; and that thereby he was the procuring cause. Prior to the effective date of the consolidation of the banks, and about May 22, 1951, plaintiff, a licensed real estate broker in St. Louis, contacted Mr. Hartnett, a vice-president of the Mississippi Valley Trust Company in charge of real estate, and inquired whether the building was to be sold; then or later he was told that it would be sold, that it would be all right for him to work on it, that the price was $2,000,000, that no one would have an exclusive listing, that a commission of 2½% would be paid, and (at some time prior to June 25) that the bank reserved the right to reject all offers and to withdraw the building from the market. After plaintiff's second interview with Hartnett he wrote to four realtors in the New York area about the proposed sale, including the C. B. Snyder Realty Company and one Leo H. Zipkin. In the letter to the Snyder Company he inquired if it would be interested in the purchase at $2,000,000, offering to furnish further information. The Snyder Company was a corporation of which C. B. Snyder was president; it employed about eighty people and was organized into various departments. Plaintiff's letter reached Max Seigel, a vice-president in charge of investments on a national basis, who listed the property for sale, and "solicited some people." He testified that one firm (Fisher-Landis) seemed interested. Seigel wrote plaintiff on June 13, 1951, stating that he would be interested if plaintiff would furnish more information, and inquired particularly about prospective

rentals on the space which the bank was vacating, being the lower four floors. Plaintiff then obtained from Hartnett a general statement of the rentals and operating expenses, a more accurate description of the property, and a picture; he forwarded these to Seigel on June 21, 1951, together with certain other more general information, and stated: "Price $2,000,000.00 and owners will pay me a commission of 2½% which I will split with you 50–50 on sale to your client." Seigel never specifically answered this proposition. Thereafter further correspondence followed between plaintiff and Seigel until approximately the end of 1951, with subsequent letters from plaintiff to Seigel dated January 28, February 23, and March 28, 1951, remaining unanswered. In the course of this correspondence plaintiff was asked for and furnished to Seigel additional information, including a detailed statement of the operating expenses, floor areas of vacant space, etc.; much of this he obtained from Hartnett; plaintiff urged from time to time that Seigel and his "clients" come to St. Louis and inspect the property. On September 11, 1951, Seigel submitted to plaintiff a tentative offer from a prospective purchaser to pay $1,750,000 for the building, with $400,000 cash, and the balance on a first deed of trust as indicated, but conditioned, however, on obtaining suitable tenants for the vacated bank quarters at not less than $175,000 per year on a minimum ten year lease. This information was promptly conveyed to Hartnett by plaintiff, though the precise means is in dispute. Plaintiff and his wife testified that he read the letter to Hartnett over the phone, and he testified that he also showed it to Hartnett; also, that he later showed Hartnett various other letters from Seigel; Hartnett denied the reading of this letter and the showing of any letters to him, and denied that plaintiff ever told him of any connection with the Snyder Company until after the sale, but he admitted that he was told of the above offer and promptly turned it down because it was not actually an offer at all on account of the conditions affixed, which

the bank would not assume. Plaintiff so informed Seigel on September 14, 1951, expressing the opinion that soon all available space could be leased, and stating again that the price quoted was $2,000,000. This offer was never substantially changed in the dealings between plaintiff and Seigel, but Seigel suggested that plaintiff get a better proposition from the bank; this plaintiff never did, although he wrote Seigel that Hartnett had agreed to submit an offer of $1,750,000. The principal difficulty in these negotiations appears to have arisen from Seigel's insistence that the bank furnish tenants for the vacant space or assume or guarantee its rentals, and the bank's positive refusal to do so. Plaintiff sent Seigel an appraisal of the value of the vacant space which he had procured independently; between the latter part of 1951 and May 7, 1952, plaintiff talked to Hartnett several times about possible tenants, and talked in person or by phone with three concerns regarding possible leases; two of these, however, had been in direct touch with the bank and one of them, the Federal Land Bank, eventually agreed to lease much of the space from the bank, shortly prior to the sale. Plaintiff wrote Seigel from time to time about the leasing prospects; Seigel, on December 18, 1951, merely confirmed his purchaser's original offer.

In July, 1951, plaintiff had taken Leo Zipkin, a New York broker, to see Hartnett and inspect the building, and Zipkin then made two offers for the building, both of which were rejected after Hartnett consulted certain other officers; one offer was for $1,500,000, all cash, and the other for a total of $1,800,000 on certain specified terms. Plaintiff had much correspondence with Zipkin; the latter insisted on a deal with 5% commission. In December, 1951, Zipkin came to St. Louis again, and told Hartnett that he could not understand the fact that the building was reportedly being offered in New York for $1,600,000; Hartnett testified that he then said that the bank's position had not changed; plaintiff testified that Hartnett

then told them that the building was also being offered by another officer of the bank, a Mr. Obermann; Zipkin testified that Hartnett admitted that the building was being offered in New York for $1,600,000. Plaintiff never talked to Obermann at any time; his negotiations with Zipkin continued to the very time of sale, but they are largely immaterial here; plaintiff notified Zipkin by letter of May 8, 1952, that the building had been sold, but he did not notify Seigel.

Richard C. Obermann had been a vice-president and senior real estate officer of the Mercantile Commerce Bank and Trust Company prior to the consolidation; thereafter, he occupied the same position in the consolidated bank; he and Hartnett held similar positions and had, for all practical purposes, equal authority. Both were trying to promote the sale, but apparently they did not discuss with each other the various brokers involved and their activities seem to have been more or less disconnected. Obermann sent out letters to various realtors and brokers advising them that the building was for sale, and sent such a letter to Seigel on January 22, 1952, offering the building at $2,-000,000. Obermann denied any and all knowledge that plaintiff and Seigel had been in communication; Obermann did not know Seigel at that time, but had known C. B. Snyder for several years. At some time prior to January 27, 1952, Obermann called C. B. Snyder to inquire whether the latter would attend a real estate meeting in Washington on January 27–28, stating that he had certain properties for sale which he wanted to discuss with Snyder. The result was that Snyder and Obermann did there discuss this building in some detail and also others, and Snyder said that he or Seigel would follow the matter up. A price of $1,600,000 was apparently mentioned by Obermann as a possibility. Obermann admitted in his deposition that Snyder probably said in the original telephone conversation that he and Seigel were working on the deal, but this was generally contradictory to his testimony

at the trial; he insisted, however, that he did not know of plaintiff's connection at all. After that meeting Seigel talked with Obermann by phone and went to St. Louis about February 6, 1952, to discuss and inspect the various buildings mentioned. He there met Hartnett, but plaintiff was not mentioned by anyone. Seigel thereafter conducted considerable correspondence with Obermann about this building but with no real result; in this correspondence Seigel suggested a proposal of purchase which was rather similar to the one which he had previously made through plaintiff, except that the total price was less; he, on behalf of the purchaser, still insisted that the bank should be responsible for the rentals of the vacant space for a period of ten years. It may be significant that Seigel admitted talking to Fisher-Landis (the concern for which he made the previous offer) after he returned from St. Louis in February, but he insisted at the trial that the Fisher-Landis deal was then "dead." The offer so made by Seigel was rejected, but this correspondence continued actively up to April 29, 1952. The bank consistently refused to assume or guarantee the rentals, but informed Seigel from time to time as to the progress of the leasing negotiations, and Obermann agreed to recommend a sale price of $1,600,000; the proposed purchaser agreed to a price of $1,600,-000, but the assumption of the rentals remained the stumbling block. However, at the end of April Seigel and his proposed purchaser appeared ready to come to St. Louis to negotiate the matter, and in fact, at approximately that same time, the bank had negotiated an agreement for the leasing of most of the vacant space. Apparently this proposal of Seigel's was abruptly terminated by the events related hereinafter.

Reverting for a moment in the chronology, Seigel never wrote to plaintiff again after Snyder's meeting with Obermann; he testified that shortly prior to February 25, 1952, he called plaintiff by phone, told him of that meeting, told him that he (Martin) had no authority to offer the building, that

he had kicked the proposition "all over the lot," that the bank preferred to make the deal on a "net basis," i. e., without commission, and, in effect, that he then and there severed the connections with plaintiff; he further testified that plaintiff replied that the bank was "crazy" and did not know what it wanted to do, that Seigel might "do as you please, I'm out." Plaintiff specifically denied any and all such conversations, and also denied receiving a letter, of which Seigel produced a supposed copy, confirming the conversation. It is clear that Seigel, expressly or otherwise, terminated his actual dealings with plaintiff in or about February, 1952.

On May 2, 1952, while negotiations were still going on between Seigel and Obermann on the pending deal, Seigel got a call from one Kutay, a Brooklyn real estate broker with whom he had had previous dealings, asking if he had anything "big." The net result was that Kutay came to see Seigel, the latter told him in detail about this building, and on May 6th or 7th, Seigel, Kutay and the two purchasers (Ryan and Berkman, who were strictly Kutay's prospects and whom plaintiff had never heard of) went to St. Louis and negotiated for and executed a contract for the purchase of the building for $1,600,000 "net." The date of the contract was May 8th. These purchasers had never been in the picture at all previously, and Seigel had never heard of them. The "net" sale meant that the bank paid no commission and Seigel and Kutay got their compensation in the form of a "consulting fee" of $36,000 from the purchasers. At the time of the contract Seigel and Kutay signed a letter addressed to defendant waiving all right to commissions from it to them. On objection of plaintiff this instrument was excluded from the evidence. During these negotiations both Hartnett and Obermann were present at times; the plaintiff was not mentioned.

Plaintiff learned on May 8, 1952, from Hartnett (probably by phone) that the building had been sold. He testified that he did not learn until the latter part of the summer that Seigel had been instrumental in effecting the purchase and sale. Thereafter demand was made on the bank for a commission and plaintiff also wrote Seigel twice demanding one-half of the commission. These letters were unanswered. The present suit followed.

Motions for a directed verdict were filed by defendant at the close of plaintiff's evidence and at the close of all the evidence. Both were overruled. An after-trial motion for judgment was filed, with an alternative motion for new trial. These also were overruled. The pertinent points now made will appear in our discussion. The parties will be referred to here as plaintiff and defendant.

Defendant insists that plaintiff made no submissible case, that the court erred in the giving and refusal of instructions, and that it erred also in excluding certain evidence. These points will be discussed generally in that order, though in some respects the first two may overlap. Defendant subdivides its first contention as follows: (a) that plaintiff was not the procuring cause of the sale; (b) that there was no sufficient proof that the Snyder Company was plaintiff's subagent; and (c) that plaintiff failed to produce a buyer ready, willing and able to purchase on defendant's terms. Plaintiff counters with the following contentions: that plaintiff was the procuring cause, that the Snyder Company was plaintiff's subagent as a matter of law and that defendant knew of this subagency, and that there were no errors in the instructions or in the rulings on evidence; moreover, that since plaintiff was the procuring cause of the sale, it is immaterial (particularly in quantum meruit) that plaintiff did not participate in the final negotiations.

■ The facts of this case are highly unusual and do not fit the facts of any adjudicated case which we have seen. This has caused some difficulty in the application to the case of various recognized principles. It appears clear to us that, in any event,

plaintiff was not and could not have been the procuring cause of the sale solely through his own efforts; he could only have been such through the agency of Seigel and the Snyder Company; he does not pretend to have found a purchaser himself or even to have talked to a prospect. We proceed, therefore, to consider the subagency contention. Plaintiff says that since the supposed employment was made by means of letters introduced as exhibits, this court must hold as a matter of law that Seigel (and the Snyder Company) was his subagent. He cites no authority based on facts at all similar. The general subject is ably discussed in the case of Schneider v. Dubinsky Realty Co., 344 Mo. 654, 127 S.W.2d 691; it was there held that where an agreement is expressed in a series of writings in terms so plain as to require no aid from extrinsic evidence, the court may declare as a matter of law whether or not an agency exists; on the other hand, if the supposed agreement is not clear, and extrinsic evidence is necessary, or where any of the material facts from which the agency must arise are in dispute, the question is one for the jury. And, furthermore, there is no presumption of agency and the burden of establishing it is always on the party by whom it is alleged to exist. Id. In the present case there was no expressed agreement of agency, nor even an expressed acceptance of plaintiff's offer to split the commission "50–50"; the correspondence, we think, establishes a submissible fact question of agency, but does not establish agency as a matter of law. Agency involves not only a mutual consent, but in the usual case, an element of control, State ex rel. Mountain Grove Creamery, Ice & Electric Co. v. Cox, Banc, 315 Mo. 619, 286 S.W. 368; Leidy v. Taliaferro, Mo., 260 S.W.2d 504, the latter of which may not be so material here, in view of the limited character of the agency claimed. There was also oral evidence from plaintiff and from Seigel's deposition, which, to some extent, supplemented the correspondence and explained the circumstances. There is another and vital reason why agency may not be declared here as a matter of law; the agency must still exist at the time of the transaction in question (the contract of sale here) to be effective. In this case Seigel claims to have positively and affirmatively terminated all his relationship with plaintiff in February, 1952. Plaintiff denies that any such renunciation occurred, but, even so, an abandonment of the agency, with notice, could conceivably be found arising from Seigel's cessation of all relations with plaintiff, beginning in January or February, 1952. An agent may renounce his agency, even though in violation of an express contract, and although his breach may create a liability for wrongful termination. Restatement of Agency, § 118; Mechem on Agency, 2d Ed., § 641; Tiffany on Agency, 2d Ed., § 86; 2 C.J.S., Agency, § 81; State ex rel. Mountain Grove Creamery, Ice & Electric Co. v. Cox, Banc, 315 Mo. 619, 286 S.W. 368. Such renunciation is generally held to be effective when the principal has notice that the agent no longer consents to act, which notice may be actual or constructive (i. e. when the principal has reason to know it, as from an abandonment.) Restatement of Agency, § 119; Tiffany on Agency, 2d Ed., § 86; 2 C.J.S., Agency, § 81; and termination may be a question for the jury. 3 C.J.S., Agency, § 330b, and cases cited; Handlan-Buck Mfg. Co. v. Stave Electrical Co., 184 Mo.App. 247, 168 S.W. 785. It is thus apparent that we may not, and we do not, hold as a matter of law that Seigel was plaintiff's subagent at the time of sale. We do hold that since it appears that if Seigel was employed as a subagent at all, it was only for the purpose of finding a purchaser, there was no prohibition existing as a matter of law against such employment. This was not a delegation of any matter of judgment or discretion, but merely the delegation of a ministerial act. See the annotation in 3 A.L.R.2d at page 533; Mechem on Agency, 2d Ed., §§ 306, 307, 315; Tiffany on Agency, 2d Ed., § 81. And, since the bank retained the right to accept or reject any and all offers, we do not think that its consent was necessary. If it was, an ac-

quiescence might be found from plaintiff's testimony.

There is no doubt that Seigel eventually produced the purchasers. The question is whether the evidence justified a submission of plaintiff's claim to compensation, through an alleged subagency existing at the time of the sale. Defendant says that it does not, citing several cases which say in effect that where an agent is given authority to sell, conditioned on certain specified terms, and he fails to produce a purchaser in strict conformity with the fixed requirements, he may not recover. The Missouri cases so cited are: Gibson v. Pleasant Valley Development Co., 320 Mo. 828, 8 S.W.2d 828; Evans v. Jacobson, Mo.App., 269 S.W.2d 156; Westerman v. Peer Inv. Co., 197 Mo.App. 278, 195 S.W. 78, and Wolcott v. Moser, 364 Mo. 443, 262 S.W.2d 620. Defendant's specific contention is that plaintiff was only authorized to procure a purchaser at a price of $2,000,000, and that even if he may claim the benefit of Seigel's procurement, he still did not comply with the terms of his limited offer (which defendant says further was merely a unilateral contract.) It is true that the bank never quoted a price under $2,-000,000 to plaintiff, although there is evidence that it had at various times, through Obermann, suggested to others that a recommendation might be made for a sale at $1,600,000. For some undisclosed reason the bank had rejected an offer of $1,800,000 from Zipkin. Indeed it seems that Hartnett and Obermann were working more or less at cross-purposes over a period of months. There are, however, numerous Missouri cases which hold that where a real estate broker has been authorized to sell property at a given price and is in fact the efficient cause of procuring a purchaser, the owner may not, acting independently or through another broker, sell to that purchaser at a lesser price and thereby deprive the first broker of his commission. Taussig, Day & Co. v. Poleman, 360 Mo. 470, 228 S.W.2d 722, loc. cit. 727; LeCompte v. Sanders, Mo.App., 229 S.W.2d 298, 301 (citing various cases); Bowman v. Rahmoeller, 331 Mo. 868, 55 S.W.2d 453; Bopp v. Jetama Inv. Co., 231 Mo.App. 815, 96 S.W.2d 877; Julius Haller Realty Co. v. Jefferson-Gravois Bank, Mo.App., 144 S.W.2d 174; Studt v. Leiweke, Mo.App., 100 S.W.2d 30; Bailey v. Hercules, Mo.App., 22 S.W.2d 855; United Farm Agency v. Cook, Mo.App., 283 S.W.2d 6; Moseley-Comstock Realty Co. v. McClelland, Mo.App., 294 S.W. 103; May v. Avansino, Mo.App., 185 S.W. 1178; see also 12 C.J.S., Brokers, § 86b; and see the annotation in 128 A.L.R. at page 430. And there are authorities to the effect that it is immaterial whether or not the owner actually knows, at the time the sale is consummated, that he is dealing with one actually procured by the agent. Lane v. Cunningham, 171 Mo.App. 17, 153 S.W. 525; and see the annotations in 142 A.L.R., p. 275, and 3 A.L.R.2d, p. 533. The reason behind the rule permitting such a recovery of commissions seems to be that a contrary holding would relieve the owner of all obligation for commissions if, at any time, he decided to take the matter into his own hands, reduce the price, even slightly, and thus cut out the agent.

There is much apparent confusion in the cases; probably the true rule is that the determination depends on whether or not the owner has actually made the obtaining of a certain price a *condition* of paying a commission. Some cases seem to so indicate. Wolcott v. Moser, 364 Mo. 443, 262 S.W.2d 620; Clarkson v. Standard Brass Mfg. Co., 237 Mo.App. 1018, 170 S.W.2d 407; Evans v. Jacobson, Mo.App., 269 S.W.2d 156. Thus, it would seem to be a question of fact here whether the price quoted to plaintiff was imposed as an express condition to the payment of compensation. There are certain factual distinctions in the individual cases cited by defendant on this point, but there is another fact which seems to differentiate the present case from all of those cases; here defendant actually consummated the sale through Seigel, whom plaintiff claims was still his subagent; there is some evidence, contradicted it is true, that the bank had

notice that plaintiff had been working through Seigel. If, therefore, Seigel could still be considered as plaintiff's subagent, then it would certainly seem that any reduction in the sale price made to Seigel would operate as a waiver of plaintiff's supposed restrictions. We hold that plaintiff is not barred as a matter of law by the claimed price limitation.

 There was enough evidence to make a submissible issue on the creation of a subagency, and its continuation, including the elements of renunciation, abandonment and notice, was also a question of fact. The jury here might, under proper instructions, have drawn an inference that from January to the end of April, 1952, Seigel was still presenting to the bank the same proposition upon which he had worked with the plaintiff. In view of the evidence of knowledge on defendant's part that plaintiff had dealt with Seigel, there may be a possible question of estoppel, i. e., whether defendant was estopped from denying an agency. We do not now hold that there was or is an estoppel, and we do not rule the point on that question. Aside from the foregoing considerations, if a subagency had actually been created, and had never been legally terminated, there would seem to be enough in the evidence to make a submissible issue as to whether plaintiff was entitled to claim the benefit of Seigel's acts. If a subagency existed and had not been terminated, Seigel's eventual procuring of Ryan and Berkman as the purchasers might have been found to bring plaintiff within the broad definitions of a "procuring cause," regardless of Seigel's direct dealings with defendant. His attempts to escape such an agency, if not legally accomplished, might be ineffective to release the rights of plaintiff, as between the latter and the bank. We hold that defendant's motions for a directed verdict were properly overruled.

 We find, however, that reversible errors appear in the giving and refusal of instructions and in the exclusion of evidence. Instruction Number 1, given for plaintiff, was as follows: "The Court instructs the jury that if you find and believe from the evidence that the plaintiff was authorized by the defendant, through its duly authorized officer, to find a purchaser for the office building at 506 Olive Street, in the City of St. Louis, Missouri, mentioned in the evidence, at a certain price and upon certain terms; and if you find that the sale of the said building was brought about through the plaintiff as the procuring cause, as defined in these instructions, then the Court instructs you that the plaintiff is entitled to compensation for the sale, based upon and not to exceed the reasonable value of his services, if any, in bringing about said sale, if you so find, even though the final negotiations were conducted by the owner and even though the owner, in order to make a sale, accepted a price less than that mentioned by said officer to the plaintiff, if you so find, or on more liberal terms than those the plaintiff was authorized to accept, if you so find. The Court further instructs you that if you find in favor of plaintiff, then to such sum, as you may find in plaintiff's favor, you may add interest at the rate of six percent per annum, from whatever date, if any, you may find from the evidence plaintiff made demand upon defendant for payment." This instruction wholly ignored the question of subagency which was the only theory upon which plaintiff could recover. We hold that the claimed facts as to the creation, existence and continuation of the subagency, as already fully discussed herein, should have been hypothesized, with appropriate instructions on the legal effect of such facts; in this manner the jury might fairly decide whether, under those circumstances, plaintiff actually was the procuring cause. The principles expressed in Yates v. Manchester, 358 Mo. 894, 217 S.W.2d 541, and explained further in the later cases of Hooper v. Conrad, 364 Mo. 176, 260 S.W.2d 496, and Knight v. Richey, 363 Mo. 293, 250 S.W.2d 972, are applicable by analogy.

**328**

There were complicated and controverted facts here which fairly required hypothesization and we hold that this instruction, as given, was in fact a "roving commission" to the jury, although we think the use of that phrase has been somewhat overdone. Under a different state of facts this instruction might have been sufficient; here, however, there was no evidence to support any instruction on "procuring cause," except through the claimed subagency. Nor do we think this erroneous instruction was adequately corrected by the giving of Instruction Number 4, which permitted a recovery if plaintiff was found to be the procuring cause "even though * * * plaintiff employed a sub-agent who interested the purchaser * * *." Suffice it to say that Instruction 4 did not contain the type of hypothesization we have suggested, and it probably accentuated the error in Instruction 1. By means of the "even though" reference this instruction gave the jury the authority to find for plaintiff "even though" it did or did not find the existence of a subagency, and with no explanation whatever of what would constitute an effective subagency. We hold that each and both instructions were erroneous. These are the only instructions of plaintiff's of which defendant complains.

 Defendant also complains of the failure of the trial court to give its Instruction A, as offered; the first paragraph of this instruction concerned plaintiff's burden of proof, and the requirement that plaintiff be the efficient and procuring cause of the sale; this part was given verbatim in the court's Instruction 7, being a modification of defendant's A; the latter part of Instruction A was as follows: "In this connection the court further instructs you that plaintiff cannot recover if you find that his acts were merely one of a chain of causes producing said sale or contributing in some degree thereto unless you also find that said acts of plaintiff were in themselves the efficient and procuring or producing cause thereof." The principle of law so declared has been announced in Mis-

souri many times. Kyle v. Kansas City Life Ins. Co., 356 Mo. 331, 201 S.W.2d 912; Boswell v. Saunders, Mo., 224 S.W.2d 125; Mack v. Mohler, Mo.App., 52 S.W.2d 188; Williams v. Mashburn, Mo.App., 37 S.W. 2d 478. Defendant was entitled to a fair converse instruction upon its theory of "procuring cause." We think that this instruction, as offered, was a fair converse; it should have been given. Defendant further complains of the refusal of its proffered Instructions D and E, explaining its theory of procuring cause, and again instructing that the plaintiff might not recover unless he was the efficient and procuring cause. We think that these were properly refused since they were, to some extent, repetitious; moreover, they ignored certain uncontroverted facts, and were therefore misleading. Since the case is to be reversed and remanded, it is wholly unnecessary to set out these instructions. Upon another trial defendant will undoubtedly be able to present one or more converse instructions which will fully present its converse theory without repetition and in accord with the facts and with this opinion.

 Defendant complains also of the refusal of its Instruction C which told the jury, in substance, that even if it found for plaintiff, a "reasonable compensation" to be awarded him might not exceed 2½% of the sale price. Plaintiff had produced evidence that the reasonable value of his services was 5% of the sale price, and he sought the recovery of $80,000 in his petition. Generally, of course, a recovery in quantum meruit may not exceed the amount fixed in the contract, if there is one. Oliver L. Taetz, Inc., v. Groff, 363 Mo. 825, 253 S.W.2d 824; C. H. Robinson Co. v. Frissell, Mo.App., 132 S.W.2d 1049. Plaintiff insists, as we can best understand his argument, that the principle is not applicable here because he had no enforceable special contract because of the fixed sale price contained in the proposal made to him. Suffice it to say that he had a definite percentage limitation, whether we call the ar-

rangement an offer, a unilateral contract or a special contract. We think the situation is within the principle of the cases defendant cites. And see Taussig, Day & Co. v. Poleman, 360 Mo. 470, 228 S.W.2d 722. However, the matter is now moot, and we make these observations only in view of another trial.

■ The remaining two points concern the exclusion of evidence. The trial court excluded a question and answer from Seigel's deposition by which he was asked, in substance, if his relation with plaintiff was that of a "co-broker," the answer being in the affirmative. The trial court held that this question called for a conclusion and we agree. Counsel argue here that it is competent for an agent to testify orally to establish his agency. That misses the point entirely. Seigel was permitted to testify fully to the facts concerning the alleged agency. This question concerned a legal status.

■ The trial court also excluded the letter executed by Seigel and Kutay which, in effect and substance, waived all right to commissions which might otherwise be payable by the bank to them; and the court also excluded an offer of oral evidence to the same effect. The evidence was excluded as irrelevant and immaterial; defendant argues here that the evidence was admissible because, if Seigel was plaintiff's subagent, the waiver was binding also on plaintiff, and would bar him of all right to compensation. It is true that generally a subagent is a representative of the agent and not of the principal; and, as indicated in a cited case, Winkleblack v. National Exchange Bank, 155 Mo.App. 1, 136 S.W. 712, the principal may not be liable for misrepresentations made by a sub-

agent of whom it had no knowledge. But that is aside from the present point. We do not think that a subagent, employed merely for the specific and limited purpose of finding a purchaser, and presumably upon a split of the commissions, could possibly have authority to waive all compensation or commissions which might be due to the initial agent. At least there would certainly have to be more evidence of such authority than there is in this record. Moreover, by its very terms the waiver concerned only commissions due the Snyder Company and Kutay. But, if proffered evidence is admissible for any purpose, it may not be excluded. State ex rel. Kansas City Public Service Co. v. Shain, 345 Mo. 543, 134 S.W.2d 58, 124 A.L.R. 1331; In re Jamison's Estate, Mo., 202 S.W.2d 879; 20 Am.Jur., Evidence, § 263. In such event the one objecting to the evidence may ask a limiting instruction, if desired. At another trial we think this evidence should be received, not for the purpose of showing a waiver binding on plaintiff, but to show that Seigel, for the Snyder Company, waived all commissions due to it; conceivably, since plaintiff originally offered that company one-half of his prospective total commission, and since he relies here on a continuation of the claimed agreement of subagency, such waiver might reduce plaintiff's recovery by one-half, either in contract or quantum meruit. This makes the evidence relevant. We do not decide the basic question, as it is not in issue here; and there may be logical arguments, both pro and con. The exclusion of the evidence was erroneous.

For the errors noted, the judgment will be reversed and the cause remanded. It is so ordered.

All concur.