Albert E. TAYLOR, Appellant,

v.

Leon H. VESTAL, Louise S. Vestal and Roberta Johnson, Respondents.

No. 45582.

Supreme Court of Missouri, Division No. 1.

July 8, 1957.

Rehearing Denied Sept. 9, 1957.

Walter R. James, R. Kenneth Elliott, North Kansas City, for appellant.

Alan F. Wherritt, William J. Turpin, Liberty, for respondents Vestals.

Joseph N. Miniace, Kansas City, for respondent, Roberta Johnson.

VAN OSDOL, Commissioner.

Plaintiff, Albert E. Taylor, a real estate broker, instituted this action on claims

stated in two counts. In Count I, plaintiff sought recovery of $1,500 alleged to be the amount defendants, Leon H. Vestal and Louise S. Vestal, had agreed to pay plaintiff as commission for the procurance of a purchaser of the Vestals' Party Line Farm in Clay County. It was alleged that plaintiff procured a purchaser, defendant Roberta Johnson, who was ready, willing and able to purchase the farm on terms satisfactory to the Vestals. In Count II, plaintiff sought recovery of $1,500 actual and $10,000 punitive damages against the three defendants, the Vestals and Roberta Johnson. In Count II, it was alleged that, although plaintiff had procured the purchaser as stated in Count I, the three defendants maliciously and wrongfully conspired to defraud plaintiff of his contractual rights and commission as a broker. The trial court submitted the issues of Count I to the jury and a verdict was returned in favor of plaintiff and against defendants, the Vestals, in the amount of $1,425; but, thereafter, the trial court sustained defendant Vestals' motion for judgment in accordance with their motion for a directed verdict and in the alternative sustained their motion for a new trial on specified grounds, including the specified ground that the evidence was insufficient in tending to show plaintiff was "the procuring cause" of the sale. At the conclusion of the evidence the trial court had sustained the motion of the three defendants for a directed verdict as to Count II. Plaintiff has appealed.

Plaintiff-appellant contends the trial court erred in rendering judgment for defendants. The supporting questions presented are (1) was there substantial evidence that plaintiff real estate broker was the procuring cause of the sale of Party Line Farm by defendants, the Vestals, to defendant Roberta Johnson; and, if so, (2) did defendants conspire together, or did one of them separately, with the design to defeat plaintiff's contractual rights, maliciously, wrongfully and fraudulently act in the consummation of the sale by direct negotia-

tions in avoidance of or to defeat plaintiff's right to a commission.

In early December, 1954, the Vestals had listed their Party Line Farm of twenty-two acres with plaintiff, a real estate broker with offices in North Kansas City. The listing was not exclusive. The Vestals were anxious to sell their farm. They had had it listed since early in 1953 with every available real estate broker they could find in North Kansas City. They asked $31,500 for the property; but they had received offers through brokers, other than plaintiff, in lesser amounts which they were unwilling to accept.

There was evidence introduced tending to show that in December, 1954, one John L. Stucker, a contractor, or builder, was looking for an acre of land or a lot on which to build a house of a new type construction. He telephoned plaintiff Taylor and inquired concerning locations of plots which could be bought at a reasonable price, explaining "what I had in mind." Although Stucker testified he was going to purchase the property himself, it seems he had insufficient cash or credit to buy the land and build, and so he sought to interest defendant Roberta Johnson in his project with the idea that she might purchase the land and "finance" Stucker's building project thereon.

Defendant (Mrs.) Roberta Johnson is the proprietor of a motel. She also owns "income" property in Kansas City. She has been a widow for fifteen years. In her real estate transactions, according to her testimony, she theretofore had sought the advice of a real estate agent of her own choice. She has a daughter who, at the time, lived in California. Before buying Party Line Farm, Mrs. Johnson sought the advice of one Field, a real estate agent. Field advised her to buy. There was evidence that Field was paid $500 by the Vestals "to take care of stamps, title guaranties, abstract, lawyer fees and closing." Stucker, plaintiff's witness, was not Mrs. Johnson's partner, and he had no authority to buy proper-

ty for her. He testified he did have authority to "'birddog'" for a piece of ground suitable for his building project and report back to her. Mrs. Johnson testified Stucker and she had "talked it over * * * he was to look. That was, of course, his idea, because he * * * wanted me to help him out."

Mrs. Johnson testified that she went with Stucker to look at Party Line Farm in December, 1954; however, Stucker testified that plaintiff showed him the farm in late January or early February, 1955; and that plaintiff and plaintiff's associate, Wilson, had again accompanied him to see the farm in middle February. Neither plaintiff nor anyone in his employ ever showed Party Line Farm to Mrs. Johnson. Stucker had said to plaintiff that he had a party, Mrs. Johnson, who was interested and asked plaintiff's permission to show her the land in plaintiff's absence. Stucker testified that as soon as he had "found" Party Line Farm, he had told Mrs. Johnson that he thought he had found land in the right location for his building project, and reasonably priced; and had asked her to look at the property. Stucker had made an appointment with plaintiff to meet him and Mrs. Johnson at the farm, but Mrs. Johnson "couldn't go." To the best of Stucker's knowledge, he had told Mrs. Johnson that plaintiff "would be there." Later, about February 20th, Stucker and Mrs. Johnson visited the farm, although plaintiff did not accompany them. This was the first time Mrs. Johnson had met defendant Leon H. Vestal. Mrs. Johnson seemed interested, and she and defendant Leon discussed the property, and a price less than $31,500.

Soon after February 20th, Stucker went to Phoenix to visit a brother who was ill. Upon Stucker's return, about March 1st, he advised plaintiff that Mrs. Johnson "was interested." He also made an appointment for plaintiff to come out to the Johnson motel "with the contract"; but, when Stucker arrived at the motel, Mrs. Johnson said she had decided not to go ahead with the pur-

chase, and he called plaintiff and told him not to come. It is apparent that at this time Stucker abandoned the idea of any association with Mrs. Johnson in the purchase of the farm, and he sought to interest the Vestals in an exchange of the farm for a residence property belonging to him in Kansas City. Defendant Leon inspected the Stucker property and rejected the proposed "trade in."

Sometime after the visit of Stucker and Mrs. Johnson at Party Line Farm, defendant Leon, according to his testimony, inquired of plaintiff by telephone "what happened to the woman that Mr. Stucker had previously brought out. He (plaintiff) said that she was not at the time interested; that Mr. Stucker had set up an appointment; that she had told Mr. Stucker that she wasn't interested; that somehow she had got to talking to lawyers or someone and 'when it gets in their hands,' he said, 'there's nothing you can do.'" Defendant Leon thought this conversation was on January 10th; although, as stated, it seems it must have been after Mrs. Johnson's visit to the farm about February 20th. Defendant Louise S. Vestal testified that Mrs. Johnson and her daughter (from California) came to see the farm in the middle to the latter part of February. Mrs. Johnson seemed interested, "but it was her daughter mostly I think that was interested." Plaintiff testified that, in the telephone conversation, "Mr. Vestal said (to plaintiff) that Mrs. Johnson seemed to be very interested. * * * Mr. Vestal related to me that Mrs. Johnson and her daughter had been out to the farm * * * * Mr. Vestal told me that the lady and her daughter had been out to the Party Line Farm and that they'd seemed very interested in the place and he asked me if I knew when Mr. Stucker would be back in town, and I did not. Mr. Stucker had gone to his brother, his brother had been ill and he'd gone out there." This was "around the first of March," according to plaintiff. There is the clear inference from the whole record that plaintiff did nothing in the interest of his principals in the fur-

therance of negotiations of a sale after his telephone conversation with defendant Leon.

Subsequently, March 15th, the Vestals entered into a contract to sell Mrs. Johnson the farm for $28,500, and the sale was consummated April 22nd. Defendant Leon had called Mrs. Johnson March 14th. He told her that he had "dropped the price" to $28,-500; that he had another bona fide offer through a broker (other than plaintiff); and that if she was interested to make a decision by five o'clock that afternoon. "Mrs. Johnson came out (on March 15th) with a real estate man (Field) of her choosing. We agreed and entered into a contract to sell, and she to buy."

In considering the questions presented herein for review, we have examined the evidence with the view of ascertaining if there was substantial evidence supporting the issues of plaintiff's claims. But, in this connection, we believe the evidence demands that we should also have in mind the principles that a party is bound by his own testimony unless corrected or explained (Steele v. Kansas City Southern R. Co., 265 Mo. 97, 175 S.W. 177); and that a party having the burden of proof on an essential issue is bound by the uncontradicted testimony of his own witnesses, unless there are facts from which the jury may draw a contrary inference. Barnum v. Hutchens Metal Products, Inc., Mo.Sup., 255 S.W.2d 807.

In this case the evidence shows that plaintiff was engaged as a broker to sell the Vestals' Party Line Farm. His engagement was not exclusive. He had shown the farm to Stucker, who, plaintiff was advised, was looking for real estate on which to build. The parties involved—Stucker, the Vestals, Mrs. Johnson and plaintiff Taylor—knew or were advised that Stucker and Mrs. Johnson were acting in contemplation of some joint adventure in the possible furtherance of Stucker's building operations. There was substantial evidence that Mrs. Johnson knew Stucker was negotiating with the Vestals through plaintiff-broker. There also was substantial evidence that the Vestals knew plaintiff, as a broker, was negotiating with Stucker, and that Mrs. Johnson was interested through Stucker. Defendant Leon testified that he "knew that Mrs. Johnson was produced by Mr. Stucker. There is an indirect connection." Hence, it could be said plaintiff had interested Mrs. Johnson, but indirectly through Stucker. As we have said, plaintiff had not interviewed Mrs. Johnson.

Here we say we have not found any factual basis in the record for an inference that Mrs. Johnson personally or in collusion with the Vestals interfered with the agential relationship between the Vestals and plaintiff. It is true she engaged one Field, a real estate agent, to advise her concerning a purchase. But we do not wish to say it is wrongful for an interested prospective purchaser to independently seek the advice and counsel of another than the broker engaged by the (vendor) principal.

Sometime in late February or early March plaintiff was told by Stucker that Mrs. Johnson had said she had decided not to go ahead with the purchase. Obviously, this complete break in the negotiations pertained to Mrs. Johnson as a purchaser in association with Stucker. But merely because she had rejected the deal in some prospective association with Stucker, it is not to be inferred that she could not have been interested and procured by plaintiff as a purchaser of the land for herself, exclusive of any association or business relationship with Stucker. She again visited the farm (with her daughter) once, perhaps twice, in late February or in early March. She and, especially, her daughter were "very interested."

"If a broker, after introducing a prospective customer to his employer to no purpose, abandons his employment entirely, or if, after procuring a person who proves to be unwilling to accept the terms of his principal, he merely ceases to make further endeavors to negotiate a deal with that partic-

ular individual and all negotiations in that direction are completely broken off and terminated, he will not be entitled to a commission if his employer subsequently renews negotiations with the same person, either directly or through the medium of another agent, and thus effects a sale without further effort on the part of the broker first employed." 8 Am.Jur., Brokers, § 144, p. 1069; and cases collated 12 A.L.R.2d 1360, at page 1367, and 27 A.L.R.2d 1348, pp. 1402-1405.

■ At this point we note the evidence— testimony of plaintiff (and of defendant Leon)—established a fact which we think decisive in defeating plaintiff's right of recovery of commission, and an insurmountable factual barrier to the establishment of any conspiracy between the Vestals and Mrs. Johnson or conduct on the part of the Vestals or either of them with a design of depriving plaintiff of his contractual right to a commission. Defendant Leon definitely told plaintiff "around the first of March," according to plaintiff's own testimony, of the visits of Mrs. Johnson and her daughter, and that they were "very interested." According to the testimony of defendant Leon, plaintiff indicated that Mrs. Johnson had been talking to " 'someone' " and " 'there's nothing you can do.' " Anyhow, as we have said, there is the indisputable inference from the record that plaintiff did not make any effort to interview Mrs. Johnson or in any way pursue negotiations to the end of inducing her to purchase. In view of the advice of the Vestals to plaintiff-broker, we believe it should not be urged that the Vestals were not justified, or were acting individually, or collusively with Mrs. Johnson, in fraud or bad faith, when, after such advice and plaintiff's inaction and apparent abandonment of all effort to procure Mrs. Johnson as a purchaser, the Vestals acted directly in resuming negotiations with her and thus, themselves, brought about a sale.

In Real Estate Enterprises v. Collins, Mo. App., 256 S.W.2d 286, 288, the plaintiff, Enterprises, had the exclusive agency to sell during a term ending August 9, 1949. Sometime in May, June or July of that year, plaintiff had attempted but was unable to induce the Carraras to buy at the list price, $35,000, and plaintiff ceased advertising the property. There was some evidence that plaintiff's salesmen had said plaintiff had " 'given it up as a bad deal.' " Meanwhile, perhaps in September, defendants, the Collinses, had called on the Carraras and renewed their interest in the property, and sold the property to them in late October. It is of import to note that the Carraras had been induced by plaintiff to become interested in the property during the term of the contract of agency and, if the interest thus induced by plaintiff during the term of the agency had been the procuring cause of the sale to the Carraras, plaintiff would have been entitled to its commission, although the sale might not have been fully consummated until after the termination of the agency. Plaintiff's case was submitted to the jury; and the jury returned a verdict for defendants. In reviewing the case upon appeal, the St. Louis Court of Appeals considered the evidence and ruled that the trial court should have peremptorily directed a verdict for defendants. It was said that, in the situation disclosed by the record, there was no evidence of fraud or bad faith on the part of defendants Collins. The prospective purchasers had informed plaintiff's salesman that they were not interested, and the subsequent sale by defendants was due, not to the negotiations of plaintiff during the term of the agency, but to defendants' efforts after the term had expired. The reviewing court further said that for one's services to be the procuring cause of a sale, "it is essential that his initial efforts in calling attention to the property shall have set in motion a series of events which, without a break in their continuity, and without interruption in the negotiations, eventually culminated in the sale. But where there is a definite break in the continuity of the negotiations amounting to an abandonment of the deal, and new forces thereafter enter which bring about a renewal of the negotia-

tions and themselves become the effective cause of the sale, the initial efforts may not then be regarded as the proximate procuring cause so as to be the foundation on which to predicate a right to a commission." See now and compare Barnum v. Hutchens Metal Products, Inc., supra, 255 S.W.2d 807.

In Taussig, Day & Co. v. Poleman, 360 Mo. 470, 228 S.W.2d 722, cited by plaintiff-appellant, there was evidence reasonably supporting the conclusion that plaintiffs, brokers, developed the deal, brought it to defendant's attention and carried on negotiations and other activities requested by defendant to the point where the owners were willing to sell at a price defendant finally accepted. There was no complete break in the protracted negotiations but each party to the deal had been trying to "wait out" the other. Plaintiffs' service was the procuring cause of the deal. In reviewing the case, this court quoted from 8 Am.Jur., Brokers, § 190, pp. 1101–1102, stating the rule applicable where a sale is brought about through a broker as the procuring cause, as follows, "The rule is well established that if property is placed in the hands of a real-estate broker for sale at a certain price or upon certain terms, and a sale is brought about through the broker as a procuring cause, he is entitled to commissions on the sale even though the final negotiations are conducted through the owner, who in order to make a sale accepts a price less than that stipulated to the broker or terms more liberal than those the latter was authorized to accept. This rule applies where the broker sends his customer direct to the owner who carries on the negotiations himself." See also Bowman v. Rahmoeller, 331 Mo. 868, 55 S.W.2d 453; Morgan v. Keller, 194 Mo. 663, 92 S.W. 75; Bell v. Kaiser, 50 Mo. 150. It is of more interest to us here to notice that the section of American Jurisprudence from which this court quoted, in reviewing the Taussig case, continues as follows, "If, however, the negotiations between parties brought together by a broker are unproductive and the parties in good faith withdraw therefrom and abandon the proposed purchase and sale, a subsequent renewal of negotiations followed by a sale at a less price does not entitle the broker to the commissions, as he cannot be said to be the procuring cause of the sale."

We hold the trial court did not err in sustaining defendants' motions for judgment and for a directed verdict on the claims as stated in Counts I and II, and in entering judgment for defendants. Barnum v. Hutchens Metal Products, Inc., supra; Real Estate Enterprises v. Collins, supra; 8 Am. Jur., Brokers, § 144, supra; Restatement of the Law of Agency, § 448, Illus. 3, p. 1053.

The judgment for defendants should be affirmed.

It is so ordered.

COIL and HOLMAN, CC., concur.

PER CURIAM.

The foregoing opinion by VAN OSDOL, C., is adopted as the opinion of the court.

All of the Judges concur.